In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3090

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

MIGUEL A. ESPINOZA,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00 CR 73--Lynn Adelman, Judge.

Argued JANUARY 25, 2001--Decided July 11, 2001

   Before COFFEY, RIPPLE and DIANE P. WOOD,
Circuit Judges.

   COFFEY, Circuit Judge.  On March 27,
2000, law enforcement officers in Racine,
Wisconsin, executed a search warrant on
Defendant-Appellee Miguel Espinoza's
residence. The search yielded large
quantities of cocaine, marijuana, and
cash. Espinoza was arrested and
subsequently charged in an indictment
with possession with intent to distribute
in excess of 500 grams of cocaine.
Thereafter, Espinoza filed a motion to
suppress all the evidence obtained in the
search of his apartment. After an
evidentiary hearing was conducted, the
district court held that the officers, in
the course of entering the outer door of
Espinoza's apartment building, failed to
comply with the timing element of the
"knock and announce" requirement as
described in Wilson v. Arkansas, 514 U.S.
924 (1995). The district court ordered
all the evidence obtained in the search
excluded. We reverse the district court's
decision to exclude evidence obtained in
the search of Espinoza's apartment and
remand for proceedings consistent with
this opinion.

I.  BACKGROUND

   On March 27, 2000, a Racine County,
Wisconsin circuit judge issued a search
warrant authorizing the search of

Espinoza's residence, the lower unit of a two-story duplex in the city of Racine. Issuance of the warrant was based upon information obtained from a confidential informant that an individual in the residence was in possession of 50-60 pounds of marijuana and a large quantity of cash.

Zachary Wright lived in the second-floor unit of the duplex while Espinoza occupied the ground-floor apartment. The residence had a single exterior entrance door that opened onto a common area. The common area consisted of a hallway, the front door to Espinoza's residence, and a set of stairs leading to Wright's upstairs apartment. Shortly before midnight on March 27, 2000, officers assigned to the Racine County Metro Drug Unit arrived at the residence. One officer knocked on the common exterior door to the duplex and announced "Sheriff's Department, search warrant." Officers then waited approximately five seconds before using a battering ram on the locked exterior door.

After gaining entry into the common area (hallway), officers saw Wright coming down the stairs. Observing Wright in descent, Racine County Sheriff's Department Investigator Thomas Bauer again announced "Sheriff's Department, search warrant," and other officers shouted at Wright to lie down on the floor. The officers then proceeded to the door of Espinoza's residence (the second door), knocked, and once again announced "Sheriff's Department, search warrant." After this announcement, the officers waited another five seconds without receiving a response from anyone inside. Investigator Bauer then attempted to kick the door open, breaking his foot in the process. This attempt to gain entry was unsuccessful, and another five to ten additional seconds elapsed while the officers positioned themselves to use the battering ram on the door of Espinoza's residence.

When the officers hit the inner apartment door with the battering ram, the door opened approximately six inches and immediately closed. While the door was briefly open, the officers observed Espinoza attempting to hold the door shut in an effort to prevent them from gaining entry. At the evidentiary hearing on

Espinoza's motion to suppress evidence, Deputy Brian Zimmermann testified that Espinoza had his back "wedged against the door with his feet propped up against the wall trying to keep us from entering." After Deputy Zimmermann hit the inner door with the battering ram an additional two times without success, he and Investigator Bauer placed their weight against the door and were able to force it open. The officers entered the apartment and proceeded to perform a search of the residence without further incident. Espinoza was the only person present in the apartment. As a result of the search, the officers recovered in excess of two kilograms of cocaine, 50 pounds of marijuana, $108,000 in cash, and other drug paraphernalia.

On April 11, 2000, a federal grand jury returned a one count indictment charging Espinoza with possession with intent to distribute in excess of 500 grams of cocaine. 21 U.S.C. sec. 841. Espinoza filed a motion seeking suppression of the evidence found in the search of his apartment. In this motion Espinoza argued that the officers had failed to wait a reasonable amount of time after announcing their presence before forcing entry into his home, in violation of the Fourth Amendment's proscription of unreasonable searches and seizures as discussed in Wilson, 514 U.S. at 930.

At the evidentiary hearing on the defendant's motion to suppress evidence, officers from the Racine County Metro Drug Unit testified that prior to executing the warrant they had no information as to whether or not weapons might be located in Espinoza's residence. Officers also testified that a five second wait between announcing their presence and forcing entry into a home was standard procedure when serving "knock and announce" search warrants.

Also testifying at the suppression hearing was Zachary Wright, the resident of the upstairs apartment. Wright stated that at approximately midnight on March 27, 2000, he was in his residence watching television and awaiting the arrival of friends. When Wright heard the officers knock at the downstairs exterior door, he assumed it was his guests, got up to let them in, and made it as far as the door of his apartment when he heard

the noises signifying the officers' use of the battering ram on the ground level exterior door. Wright then opened his door and stepped out onto the stairs where he was observed by the officers and ordered to lie on the floor.

The Magistrate Judge's recommendation to the district court found that the officers had failed to wait a reasonable amount of time after knocking and announcing before forcibly entering the outer door of Espinoza's building. The district court adopted the Magistrate's recommendation, holding that in the absence of exigent circumstances, the officers waited an unreasonably short amount of time (five seconds) between announcing their presence and attempting forcible entry through the first (common) door of the residence, contrary to the Fourth Amendment reasonableness inquiry mandated in Wilson, 514 U.S. at 929, and cases such as United States v. Anthony Jones, 208 F.3d 603, 609 (7th Cir. 2000)./1 United States v. Espinoza, 105 F.Supp.2d 1015 (E.D. Wis. 2000).

Relying on our decision in United States v. Stefonek, 179 F.3d 1030 (7th Cir. 1999), cert. denied, 120 S.Ct. 1177 (2000), the district court judge also held that the exclusion of evidence obtained in the search was an appropriate sanction for the officers' violation of the timing element of the "knock and announce" rule. The court reasoned that Espinoza was entitled to the remedy of exclusion because the timing of the officers' entry through the exterior door caused harm to Espinoza's interests as protected by the knock and announce requirement. See Stefonek, 179 F.3d at 1036. The district court judge also relied on case law from the Sixth and Eighth circuits/2 in rejecting the government's position that exclusion was inappropriate under the "independent source" or "inevitable discovery" exceptions to application of the exclusionary rule. Segura v. United States, 468 U.S. 796, 805 (1984); Nix v. Williams, 467 U.S. 431, 440-48 (1984).

The question concerning the timing of the officers' entry after their initial knock and announcement is not before us because the government has declined to raise it on appeal. Rather, the government's appeal attacks only the

appropriateness of applying the exclusionary rule as a remedy for the district court's finding of a constitutional violation. Since the issue has not been raised, we do not deem it proper to make a formal holding regarding the district court's threshold determination that a Fourth Amendment violation occurred. With that said, however, two points merit brief commentary.

First, we reiterate our previous holding that in a case not involving exigent circumstances,/3 there is no bright-line rule delineating the boundary between a reasonable and unreasonable amount of time for officers to wait after announcing their presence and before attempting forcible entry pursuant to a valid search warrant. Anthony Jones, 208 F.3d at 610; United States v. Kip Jones, 214 F.3d 836, 844 (7th Cir. 2000) (Coffey, J., concurring and dissenting). In each case where officers have allegedly not waited a sufficient amount of time before attempting forcible entry, the question must be evaluated on the basis of what time period is reasonable under the particular factual situation presented. Anthony Jones, 208 F.3d at 610; United States v. Markling, 7 F.3d 1309, 1318 (7th Cir. 1993). The point was well-stated by the Sixth Circuit as follows:

The Fourth Amendment's "knock and announce" principle, given its fact-sensitive nature, cannot be distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance.

United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999) (emphasis added).

Second, because the government does not address the merits of Espinoza's constitutional claim, we do not do so either. However, we do not want our silence on this question to be deemed approval of the district court's ruling, and we wish to make clear that we accept the district court's ruling on the existence of a violation of the Fourth Amendment only for the sake of argument.

If the subject had been presented on appeal, it would have been necessary for

us to determine whether Espinoza had a privacy interest in the common area of the duplex. See United States v. Chadwick, 433 U.S. 1, 7 (1977) (The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy.") (emphasis added). We note that the district court's ruling that the police must wait before entering the com mon hallway is in considerable tension with the principle that tenants lack a legitimate expectation of privacy in the common areas of multi-family buildings, because landlords and co-tenants are free to admit strangers. See e.g., United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991); United States v. Acevedo, 627 F.2d 68, 69 n. 1 (7th Cir. 1980). Accord, e.g., United States v. Barrios-Moriera, 872 F.2d 12 (2d Cir. 1989); United States v. Cruz Pagan, 537 F.2d 554 (1st Cir. 1976). Because of the government's strategy on appeal we need not pursue the issue further at this time, and we mention it only to avoid the impression that we have endorsed the reasoning utilized by the district court.

We now proceed to a discussion of the question presented on appeal--the appropriateness of applying the exclusionary rule to the facts of this case. Our review of the district court's decision in this regard is de novo. United States v. D.F., 63 F.3d 671, 677 (7th Cir. 1995).


II.  DISCUSSION

A.  The Knock and Announce Rule.

In Wilson, the Supreme Court held that the Fourth Amendment's proscription of unreasonable searches and seizures incorporates the requirement that law enforcement officers entering a dwelling with a search warrant must knock on the door and announce their identity and intention before attempting forcible entry. Wilson, 514 U.S. at 934./4 Although not directly addressed in Wilson, a necessary corollary of the knock and announce requirement is that officers must wait a reasonable amount of time after announcing their presence and intention to serve a search warrant before attempting a forcible entry. Anthony Jones, 208 F.3d at 609-10.

The individual privacy interests underlying the Fourth Amendment's knock and announce requirement, as identified by the Supreme Court, are: (1) the opportunity for individuals to comply with the law and peaceably permit officers to enter the residence; (2) avoiding the destruction of property occasioned by forcible entry; and (3) the opportunity for individuals to "prepare themselves" for entry by law enforcement officers by, for example, "pull[ing] on clothes or get[ting] out of bed." Richards, 520 U.S. at 393 n. 5; Wilson, 514 U.S. at 930-32.

B. Application of the Exclusionary Rule is Not Appropriate for All Violations of the Fourth Amendment.

The United States Supreme Court has not ruled on the issue of whether, or under what circumstances, the exclusionary rule should be used as a remedy for violations of the knock and announce requirement. Wilson, 514 U.S. at 937 n. 4; Ramirez, 523 U.S. at 72 n. 3./5

We know, however, that the exclusionary rule is not a constitutionally compelled remedy for violations of the Fourth Amendment, and that the introduction at trial of illegally seized evidence does not, of itself, rise to the level of a violation of any rights protected by the Constitution. United States v. Leon, 468 U.S. 897, 906 (1984)./6 Rather, the exclusionary rule operates strictly as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than as a personal constitutional right" that may be invoked by a criminal defendant. United States v. Calandra, 414 U.S. 338, 348 (1974). Thus, whether the exclusionary rule is appropriately imposed in a particular case is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police misconduct." Leon, 468 U.S. at 906, quoting Illinois v. Gates, 426 U.S. 213, 223 (1983).

We are well aware of the fact that there are competing interests at stake when courts are called upon to decide whether or not to exclude evidence as a remedy

for a violation of the Fourth Amendment's reasonableness requirement. Obviously, we are in full agreement with the underlying purpose of the exclusionary rule: to deter illegal police conduct by punishing the behavior and removing the incentive for its repetition. United States v. Salgado, 807 F.2d 603, 607 (7th Cir. 1986).

On the other side of the ledger, it is beyond dispute that the exclusion of evidence as a deterrent to police misconduct involves significant social costs. The exclusionary rule by definition deprives courts and juries of probative evidence of a crime, and thereby offends the important societalinterest in prosecuting, punishing, and deterring criminal conduct. See Nix v. Williams, 467 U.S. 431, 442-43 (1984).

The appropriateness of applying the exclusionary rule to a particular case is in large part the product of weighing and balancing these competing interests. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734 (1980). Indeed, it is well-recognized that indiscriminate application of the exclusionary rule may well "generat[e] disrespect for the law and administration of justice." Stone v. Powell, 428 U.S. 465, 491 (1976). Accordingly, application of the exclusionary rule "has been restricted to those areas where its remedial objectives are thought most efficaciously served." Calandra, 414 U.S. at 348.

C. The Exclusion of Evidence is a Disproportionately Severe Sanction in Cases Where the Police Conduct Does Not Actually Harm Protected Interests.

Several well-established principles guide our balancing of the competing interests served and harmed by the exclusionary rule. Pertinent to this case is the principle that "the exclusionary rule is a sanction, and sanctions are supposed to be proportioned to the wrong-doing that they punish." Salgado, 807 F.2d at 607. The idea that sanctions must be

proportioned to the gravity of the wrong has become an important element of Fourth Amendment jurisprudence. Stefonek, 179 F.3d at 1035. The Supreme Court has emphasized the role of proportionality in assessing the propriety of excluding evidence as a remedy for Fourth Amendment violations as follows:

The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the [exclusionary] rule is contrary to the idea of proportionality that is essential to the concept of justice.

Stone, 428 U.S. at 490.

We find substantial guidance on the question of proportionality from our decision in Stefonek. In that case, we held that where the violation of the Fourth Amendment in a particular case causes no discernable harm to the interests of an individual protected by the particular constitutional prohibition at issue (in the present case the knock and announce requirement), the exclusion of evidence for the trial is a disproportionately severe and inappropriate sanction. Stefonek, 179 F.3d at 1034-35. In other words, the principle of proportionality demands that the application of the exclusionary rule should be limited only to those instances where the constitutional violation has caused actual harm to "the interest (whether in privacy or in a fair trial) that the rights protect." Stefonek, 179 F.3d at 1036./7

At issue in Stefonek was the use of language in a search warrant authorizing the seizure of "evidence of crime." Stefonek, 179 F.3d at 1032. This all-inclusive "description" of the items subject to seizure was properly found to fall short of satisfying the Fourth Amendment's requirement that a search warrant "particularly describe the things to be seized." Id. However, the constitutionally infirm generality of the warrant contrasted with the affidavit accompanying the application for its issuance, which clearly specified the particular items to be seized. Id. When executing the warrant, officers did not seize any property other than those items listed in the affidavit. Id.

Under the circumstances presented, Stefonek clearly held that exclusion of the evidence seized pursuant to the warrant was a disproportionately severe, and thus an inappropriate, remedy for the clear violation of the Fourth Amendment's requirement that a warrant identify the particular items to be seized. Stefonek, 179 F.3d at 1033-34. This disproportionality was established by circumstances demonstrating that the interest protected by the particularity requirement (to ensure that a search does not invade an individual's privacy interests beyond those necessary to achieve a valid law enforcement purpose) was neither harmed nor infringed upon by the actual search that occurred. Id. The following quotations from Stefonek are an apt summary of its holding:

[W]e do not think that the consequence of the violation of the Fourth Amendment in this case should be the suppression of the evidence seized . . . [Because] [t]he seizure caused no harm to the policy that underlies the requirement that a search warrant describe with particularity what is to be seized.

* * *

[T]he violation of the Fourth Amendment in this case did no harm to any of the interests that the amendment protects, so that exclusion of the evidence seized under the warrant would be a disproportionate sanction.

Stefonek, 179 F.3d at 1033, 1035 (emphasis added).

In reaching our conclusion in Stefonek, we made an analogy to the common law doctrine that even the most blatantly negligent conduct is not actionable in tort unless it causes injury. Stefonek, 179 F.3d at 1035. So too in the arena of Fourth Amendment jurisprudence. The exclusion of probative evidence is too disproportionately severe a remedy where the Fourth Amendment violation has not harmed the particular interest protected by the constitutional requirement at issue.

   D. The Officers' Conduct Did Not Harm Espinoza's Interests Protected by the Knock and Announce Rule.

Stefonek's analysis of the disproportionality principle is equally applicable to the current factual situation. To reiterate, the interests of an individual (whose premises are subject to a valid search warrant) protected by the knock and announce requirement are: (1) the opportunity to comply with the law and peaceably permit officers to enter the residence; (2) the avoidance of unnecessary destruction of property occasioned by forcible entry; and (3) the opportunity for individuals to dress, get out of bed, or otherwise prepare themselves for entry by law enforcement officers. Richards, 520 U.S. at 393 n. 5; Wilson, 514 U.S. at 930-32. The core interest protected by the knock and announce requirement is therefore the receipt of notice by occupants of the dwelling sufficient to avoid the degree of intrusiveness attendant to a forcible entry as well as any potential property damage that may result.

Given Espinoza's resistive physical response to the officers' attempt to gain forcible entry into his home (holding the door shut to prevent the officers from entering) we fail to see how the officers' alleged failure to wait an objectively reasonable amount of time before forcing the doors caused any harm to Espinoza's interests (whether in privacy or property) protected by the knock and announce requirement./8 If the officers had waited thirty seconds, or a min-ute, or two minutes, before attempting forced entry, would Espinoza have complied with the law and allowed officers to peaceably enter, thereby saving the destruction of his door? The answer is "no." If Espinoza had any intention of allowing the officers into his residence and saving the destruction of the door, common sense dictates that he would have done so after hearing the first knock and announcement and the sounds of the officers crashing through the outer (first) door with the battering ram--he would not have attempted to hold the inner (second) door shut. The record leads us to conclude that if the officers had waited longer before forcing the door, the only "preparation" that would have been undertaken by Espinoza was the erection of a more formidable barricade using furniture or whatever else was readily available. Espinoza's decision to

take affirmative action to prevent the officers' entry convinces us that had the officers waited five seconds, sixty seconds, or more, Espinoza would have not only refused them admittance, but would have attempted to prevent their entry./9 Assuming, as we must in this case, that the officers failed to comply with the timing element of the knock and announce requirement, the only "interest" of Espinoza's that would have been furthered was his interest in more effectively interfering with the officers' duty to take possession of and confiscate the illegal drugs. Espinoza's "interest" in thwarting the entry of officers armed with a valid search warrant is certainly no more compelling than a suspect's supposed "interest" in hastily destroying evidence of a crime or arming himself while officers wait patiently at the door. The protection of an individual's interests underlying application of the exclusionary rule do not extend to any "right" to engage in further criminal activity. Segura, 468 U.S. at 816 ("[W]e decline to extend the exclusionary rule, which already exacts an enormous price from society and our system of justice, to further 'protect' criminal activity[.]"); Kip Jones, 214 F.3d at 838. In short, we are aware of no lawful interest of Espinoza's that was harmed by the officers' alleged constitutional error. The district court was mistaken in concluding, without explanation or analysis, that the officers' conduct caused harm to Espinoza's protected interests.

   In reaching our conclusion on the remedial issue, we note that Espinoza has not at any time argued that he was unaware that the individuals attempting to enter his residence were law enforcement officers. Nor does he allege that officers failed to identify themselves or announce the purpose for their presence at the door. Contrary to the position taken by the dissent, the absence of these factors precludes the possibility that Espinoza barricaded the door in the mistaken belief that someone other than law enforcement officers were attempting to force their way into his home.

   Public concern over the cancer of illegal drug trafficking, and the desire to punish those who choose to engage in

this criminal behavior, are important societal interests that would be sacrificed by application of the exclusionary rule to this case. These compelling public interests, when weighed against the absence of any discernable harm to Espinoza's interests protected by the knock and announce requirement, compel the conclusion that the remedy of exclusion of the evidence is a disproportionately severe and inappropriate sanction for the officers' alleged constitutional error./10 Because we find this issue to be dispositive of the appeal, we need not address the parties' other arguments relating to the applicability of the "independent source" or "inevitable discovery" exceptions to application of the exclusionary rule. See Segura, 468 U.S. at 805; Nix, 467 U.S. at 440-48./11

We do not wish our opinion on the applicability of the exclusionary rule to this particular factual situation to be interpreted as condoning the procedures used by the Racine, Wisconsin law enforcement officers as set forth in this record. The standard operating procedure of the Racine County Metro Drug Unit to serve knock and announce search warrants in the middle of the night and to pause five seconds between announcing their presence and forcibly entering a residence may very well continue to expose the department to situations in which problems of a constitutional dimension are unnecessarily created. It should be self-evident that we do not condone a practice that has this effect, and we caution law enforcement officers to conduct themselves in a manner respectful of the interests of their fellow citizens protected by the Fourth Amendment. The fact that Espinoza's interests were not harmed under the peculiar facts of this case in no way detracts from the obligation of officers to zealously protect each individual's constitutional rights and strictly observe the parameters of the Constitution.

III.  CONCLUSION

We hold that the evidence obtained during the search of Espinoza's residence should not be excluded on Fourth Amendment grounds because the remedy of exclusion is a disproportionately severe

sanction for the officers' alleged misconduct. The decision of the district court is REVERSED, and this case REMANDED for further proceedings consistent with this opinion.

FOOTNOTES

/1 Due to the number of cases in this area in which the defendant's name is Jones, we will attempt to avoid confusion by citing these cases using the defendant's full name.

/2 United States v. Dice, 200 F.3d 978 (6th Cir. 2000), and United States v. Marts, 986 F.2d 1216 (8th Cir. 1993).

/3 The Fourth Amendment does not require officers to "knock and announce" when they have a "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997); see also United States v. Ramirez, 523 U.S. 65, 67-68 (1998). In other words, officers need not knock and announce prior to forcible entry when they have a reasonable suspicion that advanced notice would result in the inhabitants arming themselves or disposing of drugs or other evidence. Richards, 520 U.S. at 391; Wilson, 514 U.S. at 936.

/4 As previously noted, the Fourth Amendment does not prohibit unannounced entry in all situations, and takes into account the potential for danger to officers as well as the propensity of a defendant to dispose of the evidence. Wilson, 514 U.S. at 934; Richards, 520 U.S. at 387-93. The exceptions to the knock and announce requirement are not pertinent to our review in this case.

/5 In Wilson, the Court declined to address the remedial issue, finding it to be beyond the narrow question on which certiorari was granted. Wilson, 514 U.S. at 937 n. 4. In Ramirez, the Court concluded that no violation of the Fourth Amendment had occurred, thus making consideration of the remedy unnecessary. Ramirez, 523 U.S. at 72 n. 3.

/6 Indeed, standing to even invoke the exclusionary rule is "limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct," and the rule has no application to the introduction of illegally seized evidence against the victim's co-conspirators or co-defendants. Leon, 468 U.S. at 910.

/7 Because our opinion in Stefonek scrupulously avoided using the inevitable discovery exception to the exclusionary rule as the basis for decision, we fail to understand what the dissent means to imply when stating that the holding in Stefonek was "in keeping with the spirit" of the inevitable discovery doctrine. While Stefonek described its holding as being "a similar case" to a case implicating the inevitable discovery rule, the opinion went on to hold that the difference between the two scenarios was that "here the lack of injury to a protected interest is a certainty rather than merely a probability." Stefonek, 179 F.3d at 1035. To borrow a phrase from the dissent, the "logical foundation" of our holding in Stefonek was that the lack of harm done to a protected interest rendered exclusion too disproportionately severe a remedy.

Indeed, the proposition that Stefonek is an "inevitable discovery" case falters under the weight of the dissent's explanation of the doctrine. According to the dissent, "the Court has limited the use of the inevitable discovery idea to situations in which law enforcement was engaged, or did engage, in a violation-free investigation that would have yielded or did yield the disputed evidence." Accepting the accuracy of the dissent's interpretation of the inevitable discovery doctrine (a debatable subject in light of United States v. Dennis Jones, 149 F.3d 715, 716–17 (7th Cir. 1998), and Kip Jones, 214 F.3d at 838), the dissent's view precludes the possibility that Stefonek was decided on the basis of the inevitable discovery doctrine. In Stefonek, as in the case before us, there was only one search performed. There was no second legally executed search, no second search warrant obtained, no "other ongoing investigation" that would have yielded the same evidence, and no "separate, untainted source for the seized evidence."

/8 Contrary to statements made in the dissent, our conclusion that no harm was done to Espinoza's interests as protected by the knock and announce rule is based on his attempt to hold the door shut, and has nothing to do with the evidence eventually discovered during the search of his apartment.

/9 The dissent is concerned that our holding relies on facts that emerged after the officers' entry through the common door. According to the dissent, this "amounts to a significant departure from Supreme Court precedent and from Stefonek." After coming to this conclusion, however, the dissent neither delineates any Supreme Court decisions to the contrary nor explains how our holding is inconsistent with Stefonek. Rather,

the dissent cites two cases that we do not believe are applicable, Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2000), and United States v. Hall, 142 F.3d 988, 995 (7th Cir. 1998). Both of these cases involved the question of whether officers violated the proscriptions of the Fourth Amendment. Here, in contrast, we are concerned with a separate and distinct question, namely the appropriateness of applying the exclusionary rule in light of the need for proportionality in sanctioning police misconduct. The dissent has cited no case law in support of its idea that the remedial question must turn exclusively on facts known to the officers prior to their allegedly unconstitutional actions.

   With respect to the remedial issue (the only issue before us), we are therefore less concerned with the state of the officers' knowledge at the time they arrived at Espinoza's residence than we are with what actually happened during the course of the ensuing entry and search. This analytical framework is precisely the one employed in Stefonek, where the lynchpin of our holding was that a post hoc review of the search actually performed pursuant to the defective warrant did not exceed the limits specified in the affidavit used to obtain it. The evidence that was seized during the search performed in Stefonek was a fact that obviously could not have been "known" to law enforcement officers prior to the commission of the constitutional violation.

/10 We reached the same conclusion in Stefonek: "Thus we know that no lawful interest of Stefonek's was harmed by the constitutional error, and equally that the taxpaying and law-abiding public will be harmed if her conviction is thrown out because of the error." Stefonek, 179 F.3d at 1035.

/11 We note that a primary focus of the dissent is the rejection of the government's argument that the inevitable discovery doctrine should be applied to this case. We neither endorse nor reject the dissent's views on this subject, and hold the question to be beyond the scope of what is necessary for resolution of the appeal.

   DIANE P. WOOD, Circuit Judge, dissenting.  While I agree with the majority that one must analyze Fourth Amendment cases on their facts, in my view the uncontested factual record before us on this appeal requires us to affirm the district court's decision to suppress the evidence found in Miguel Espinoza's apartment. I therefore respectfully dissent.

The majority's description of the facts underlying the motion to suppress accurately sets the stage for the legal issue presented to us: whether the exclusionary rule should be invoked here to suppress the drugs, cash, and drug paraphernalia that the Racine County Sheriff's officers seized in the wee hours of March 27-28, 2000. And, as the majority agrees, a series of concessions has removed some potentially interesting issues from the scope of this appeal. We therefore have no occasion to question two important propositions: first, that the officers waited an unreasonably short period of time between announcing their presence and forcibly entering first the building and then Espinoza's unit (five seconds, each time), and second, that the speed of the officers' entry was not justified by exigent circumstances. A change in either one of those facts obviously would have made a difference to our analysis.

With that much established, the majority goes on to apply the framework established in United States v. Stefonek, 179 F.3d 1030 (7th Cir. 1999), to the question whether the remedy afforded by the exclusionary rule should be applied here. In Stefonek, this court first concluded that the police did not have an adequate warrant to justify their seizure of certain business records, because the warrant itself was so vague that it amounted to an impermissible general-warrant, and it failed to incorporate a more specific affidavit by reference. Id. at 1033. The court expressed concern about the applicability of the good-faith exception to the warrant requirement that the Supreme Court created in United States v. Leon, 468 U.S. 897 (1984), because the defect in the warrant was so obvious. Rather than rely on Leon, the court reviewed the circumstances under which suppression is (or is not) necessary in order to further the purposes of the Fourth Amendment rule in question. Those purposes include a concern for protecting the property and privacy of the individual whose premises are to be searched and property to be seized, the need to confine searches to constitutional limits, and a desire to head off avoidable breaches of the peace (of particular importance to the "knock and announce" aspect of the rule). In keeping with the spirit of the inevitable discovery exception to the Fourth Amendment's exclusionary rule, the court then looked to the factual record to determine whether the police officers' actual conduct infringed upon any of these interests. No harm, no foul, said the court. The officers had established probable cause to obtain a warrant and they had limited their search to matters consistent with the probable cause affidavit. Had the magistrate

judge simply incorporated the existing affidavit by reference in the warrant, exactly the same materials would have been seized. Because this safeguard was in place and the search was just as confined as it would have been if everything had gone according to plan, no harm resulted from the technical violation of the rules and no suppression was necessary. In spirit, if not in detail, this ruling followed the same line of thinking as the Supreme Court's decisions in Nix v. Williams, 467 U.S. 431 (1984), and Leon.

My concern here is that the majority has unmoored the intermediate step of Stefonek from its logical foundation. The error in Stefonek did not warrant suppression precisely because the officers themselves never violated the interests protected by the Fourth Amendment. Given the very specific nature of the affidavit that had been prepared before the warrant was executed and the properly limited scope of the subsequent search, the court found that case to be suitable for the application of a kind of harmless error rule.

Our case is different in several respects. The problem was not with the specificity of the warrant, but instead was with the manner in which the warrant was executed. There was nothing in the record to show that ex ante everything was in order. Indeed, the evidence in the record points the other way and suggests with some force that the Racine County Sheriff's Department has a practice of unconstitutionally executing warrants. As the majority notes and rightly criticizes, the Department has a policy of waiting only five seconds before serving "knock and announce" warrants. Especially in the middle of the night, which seems to have been the Department's preferred time for serving warrants, hardly anyone could scramble out of bed and reach the door in time to make a peaceful entry possible. Espinoza's is a case in point. Consistent with the Department's policy, the officers crashed through the front door of Espinoza's duplex at midnight after waiting only five seconds. In doing so, they deprived Espinoza of the opportunity to permit the officers to execute their warrant without the use of unnecessary force and property damage. Contrary to the majority's conclusion, and in contrast to the officers in Stefonek, the Racine County officers therefore did offend the interests protected by the Fourth Amendment "knock and announce" rule.

Relying largely on Espinoza's efforts to keep the officers from entering the interior door to his apartment, themajority disagrees with this conclusion. Its rationale, however, amounts to a significant departure from Supreme Court precedent and from Stefonek. Normally Fourth Amendment

issues are analyzed on the basis of information available to the police at the time they act: at the time they claim probable cause is present, Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2000), at the time they obtain a warrant, United States v. Hall, 142 F.3d 988, 995 (7th Cir. 1998), or at the time they execute a warrant. This perspective reflects the fact that after-acquired information about the defendant's alleged criminal activity should not influence either the scope of the defendant's Fourth Amendment rights or whether they were violated.

The majority reasons that the officers' actions did not offend any interests protected by the Fourth Amendment because Espinoza made it clear by his actions that he had no intention of taking advantage of the opportunities afforded to him by the "knock and announce" rule. But whatever actions Espinoza took were not actions that were inevitably suspicious at the time the officers broke down the front door. The majority's reasoning holds together only if we are willing to consider at the suppression stage evidence that cannot be considered at the violation stage. In light of the evidence that Espinoza was later found to be in possession of a substantial quantity of drugs, the majority argues that his attempt to block the interior door must as a matter of law be regarded as proof that he would not have opened the front door even if he had been given a constitutionally sufficient opportunity to do so. If, on the other hand, we disregard the after-acquired evidence, there is no reason to think Espinoza's efforts to block the interior door were anything other than a natural defensive response to hearing someone crash through his front door in the middle of the night and then start to try to break down the interior door. Viewed from this perspective, Espinoza's actions tell us little about what he would have done had he been given proper notice of the police's desire to gain entry through the front door.

Perhaps recognizing the vulnerability of such a post hoc approach to the issue, the government has fought the suppression order in a different way. It argues flatly that the exclusionary rule should never be available to redress Fourth Amendment violations that pertain "only" to the manner of executing a warrant, not to the scope of what premises may be searched or what may be seized. As long as the officers have a valid warrant, discovery of whatever lies within will inevitably occur, no matter how flagrantly the entry tactics violate the purposes of the Fourth Amendment. The majority has wisely refused to accept this per se rule. The Supreme Court has never indicated that such a blanket rule is

appropriate; to the contrary, it has always stressed the fact-specific nature of Fourth Amendment inquiries. The inevitable discovery and independent source doctrines have consistently been construed so as to preserve suppression as a remedy designed to deter police misconduct in certain circumstances. Nix v. Williams, 467 U.S. 431, 444 (1984) (explaining that where untainted ongoing search would have turned up evidence "deterrence rationale has so little basis that the evidence should be received"); Murray v. United States, 487 U.S. 533, 539-40 (1988) (emphasizing continued deterrent effect of rule that permits officers to obtain and execute proper warrant after first conducting illegal search).

Suppression retains its deterrent effect only so long as it is consistently applied to prevent law enforcement officers from benefitting from their Fourth Amendment violations. The "no benefit" principle would be destroyed if, as the government suggests, it is always sufficient for officers to spell out after the fact a hypothetical scenario by which they could have properly obtained the evidence. In order to avoid this reductio ad absurdam, the Court has limited the use of the inevitable discovery idea to situations in which law enforcement either was engaged, or did engage, in a violation-free investigation that would have yielded or did yield the disputed evidence. In Nix, the Court found illegally obtained evidence admissible because the government was able to prove by a preponderance of the evidence that an independent ongoing investigation would have led law enforcement to the same evidence. 467 U.S. at 448-50. Similarly, in Segura v. United States, 468 U.S. 796, 813-16 (1984), after entering and seizing the suspect's premises without a warrant, the police obtained a warrant without relying on any of the information obtained from the original entry and properly seized evidence pursuant to that valid warrant. In Murray, the police conducted a warrantless entry and seized evidence, but then they obtained a warrant without relying in any way on the seized evidence and re-executed the search and seizure. Emphasizing the importance of a separate, untainted source for the seized evidence, the Court explained that "[t]he ultimate question . . . is whether the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence at issue. This would not have been the case if the agent's decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." 487 U.S. at 542. The only way to read these cases is as a rejection of the kind of wholesale "we could have

conducted a proper search" approach urged by the government.

In this case, there are no facts comparable to those in Nix, Murray, and Segura that would allow us to recognize the inevitable discovery doctrine without undermining the suppression remedy's deterrent effect. The evidence seized in Espinoza's apartment was the product of only one illegally executed search and as such is subject to exclusion. Segura, 468 U.S. at 804. This is in marked contrast to Segura, where subsequent to the illegal entry a proper search was conducted and "[t]he illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant." Id. at 815. In Espinoza's case, there was no other investigation ongoing that would have yielded the same evidence and the police did not, after the fact, obtain and properly execute another warrant. Rejecting the government's attempt to invoke inevitable discovery on these facts does not put the government in a worse position than it otherwise would have been in. It merely prevents the government from benefitting from an illegal search. Without a requirement of at least one untainted investigation apart from the unlawful one before the exclusionary rule can be avoided, the exclusionary rule itself would be severely undermined, and along with it, the salutary deterrent effect it provides.

On the broad question whether suppression is an available remedy when the manner of executing a valid warrant violates the Fourth Amendment, I thus agree with my colleagues on the Sixth and Eighth Circuits who have said that in certain cases it is. See United States v. Dice, 200 F.3d 978, 984 (6th Cir. 2000) (rejecting inevitable discovery in "knock and announce" violation case where there was no evidence of a properly conducted investigation that would have led to the same evidence); United States v. Marts, 986 F.2d 1216, 1220 (8th Cir. 1993) (same). I realize there are recent opinions from this court that, if read expansively, might be thought to look the other way. See, e.g., United States v. Kip Jones, 214 F.3d 836 (7th Cir. 2000). But such an interpretation would be inconsistent with the Supreme Court's jurisprudence requiring an actual independent source of the tainted evidence. Rather than take this step, I think it better to consider the statements in Kip Jones in light of the facts there presented, which are distinguishable from the ones now before us. As Judge Coffey's separate opinion (dissenting in part and concurring in part) in Kip Jones makes clear, there were ample facts in the Kip Jones record to support the reasonableness of the methods the police officers chose to use under the circum-

stances they faced there. Most importantly, there was definitely no concession from the government in Kip Jones that the entry or its methods were unreasonable. We have such a concession here, and as I stressed at the outset, it is in that light that I approach this case.

The remaining question is whether the Fourth Amendment violation in our case requires suppression of the evidence that was seized, or if Espinoza should be remitted to his other, largely illusory, remedies. I agree with that portion of the majority's opinion that emphasizes the fact-specific and balancing approach that we must take to this question. Again, however, we are constrained by the government's concessions, including, in particular, its concession that the Fourth Amendment violation in this case occurred when the officers waited only five seconds before crashing through Espinoza's front door. It is plain that Espinoza was not involved in any obstructive action at that time. The officers had a constitutional obligation to give Espinoza adequate notice of, and an opportunity to respond to, their presence. They denied him that opportunity, even though they had no indication that Espinoza would not take advantage of it. The fact that Espinoza took steps to prevent the officers from entering through the interior door after they had already violated his rights at the front door does not make the officers' violation of Espinoza's Fourth Amendment rights, and the interests protected by those rights, any less flagrant.

Looking at the situation at the time the officers started barging into Espinoza's building, therefore, and taking into account the two critical factual concessions, I would affirm the district court and suppress the evidence. My conclusion that this is the legally correct outcome does not in any way reflect a view that it is unimportant to enforce the drug laws, or any other laws for that matter. On the other hand, as the recent tragic killing of the young Baptist missionary, Roni Bowers, and her infant daughter in Peru by drug enforcement officials illustrates, overzealous enforcement tactics can sometimes inflict injury on someone whose innocence or guilt is unknown until it is too late. See Irvin Molotsky, Baptists' Plane Identified As Drug Carrier, N.Y. Times, April 22, 2001, at A1. The protections established by the Fourth Amendment, as well as the principal remedy courts have used for years to redress violations of that amendment, are designed to respect personal interests and to deter unconstitutional police behavior. In this case, the officers carried out their mission in an unconstitutional way, and I agree with the district court that suppression

was the proper remedy.

I therefore respectfully dissent.