# Illinois Official Reports

## Appellate Court

> ### *People v. McGregory*, 2019 IL App (1st) 173101

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. HOMER McGREGORY, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-17-3101 |
| Filed | June 25, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-7741-01; the Hon. Carol M. Howard, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick, Lindsey Beyer Payne, and Erin M. O'Connell, Assistant Attorneys General, of counsel), for the People.<br><br>Richard C. Kloak, of Chicago, for appellee. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Justices Hyman and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1    The State appeals from the Cook County circuit court's grant of defendant Homer McGregory's motion to suppress evidence, arguing that the trial court erred in concluding that the eight-month delay between the seizure of defendant's property and the obtention of a search warrant to search the contents of that property rendered the seizure unreasonable. For the reasons that follow, we affirm.

## I. BACKGROUND

¶ 2

¶ 3    On May 13, 2013, the Chicago Police Department (CPD) executed a search warrant on defendant's home in search of drugs and weapons. While there, the executing officers found and seized computers and other equipment often associated with the manufacture of fraudulent credit cards. The equipment remained in the possession of the CPD until November 1, 2013, at which time Agent Gustav Woerner of the United States Secret Service took possession of it as part of an investigation into defendant in connection with a credit card fraud scheme. In January 2014, Woerner obtained a search warrant to examine the contents of the computers and equipment, which revealed credit card numbers and other evidence of identity theft. Thereafter, defendant was charged with identity theft (720 ILCS 5/16-30(a)(2) (West 2012)).[1]

¶ 4    Defendant filed a motion to suppress evidence, arguing that the initial seizure of the equipment was unreasonable, as was the delay between its seizure and the obtention of the warrant to search the contents of the equipment. In response, the State argued that the seizure of the equipment was reasonable, because it was in plain view at the time that the CPD executed its search warrant for narcotics and weapons on May 13, 2013. As for the delay between the seizure of the equipment and the obtention of the search warrant for the contents of the

---

[1]It appears that only those documents relevant to the issues on appeal were included in the record, and the indictment was not among them. The State, however, included the indictment in its appendix. Generally, it is improper for a party to include in its appendix documents that are not included in the record on appeal. *Pine Top Receivables of Illinois, LLC v. Transfercom, Ltd.*, 2017 IL App (1st) 161781, ¶ 2 n.1. Because the contents of the indictment are not relevant to the issues on appeal, however, its inclusion in the appendix is harmless. We pause only to note an irregularity in the indictment for purposes of being accurate in our recitation of the facts of this case. The indictment alleged that defendant committed the offense of identity theft on May 13, 2013, and cited section 16G-15(a)(2) of the Criminal Code of 1961 (720 ILCS 5/16G-15(a)(2) (West 2010)) as the statute defendant violated. We observe that section 16G-15(a)(2) was repealed effective January 1, 2012 (Pub. Act 97-597, § 6 (eff. Jan. 1, 2012)), over a year before defendant is alleged to have committed the offense of identity theft. Nevertheless, on May 13, 2013, there was in effect section 16-30(a)(2) of the Criminal Code of 2012 (720 ILCS 5/16-30(a)(2) (West 2012)), which defined the offense of identity theft as it was alleged in the indictment against defendant. Accordingly, it appears that the reference to the repealed identity theft statute in the indictment was a typographical error, which defendant does not allege—at least to us—prejudiced him. See *People v. Burke*, 362 Ill. App. 3d 99, 103 (2005) (a defect in a statutory citation in an indictment does not warrant reversal where the indictment adequately informs the defendant of the charges and the defendant cannot demonstrate prejudice from the incorrect citation); see also *People v. Melton*, 282 Ill. App. 3d 408, 415 (1996) ("Although the statute cited in the charging documents was no longer in effect, the criminal offense of child endangerment was still embodied in the Criminal Code. Accordingly, defendants' claim that they were convicted of a nonexistent crime is without merit.").

equipment, the State argued that it was not unreasonable, because the officers were diligent in obtaining the search warrant and defendant did not request the return of the equipment, did not allege any harm to his possessory interest in the equipment, and did not argue that he needed the equipment for legitimate reasons.

¶ 5    At the evidentiary hearing on defendant's motion to suppress, two witnesses testified. First, Officer Vaneond Chinchilla of the CPD testified that he was present on May 13, 2013, when the search warrant for narcotics and weapons was executed at defendant's home. The officers did not find any guns or drugs in defendant's home, but they did find four laptops, a credit card duplicator, a strip reader, several computers, an embossing machine, and credit cards and identification cards bearing names other than defendant's. Based on his training and experience, Chinchilla believed the equipment to be used to make credit cards to steal people's identity. Defendant stated that he bought the equipment online and that some of the machines worked 30% of the time. At the time the equipment was seized, defendant did not tell Chinchilla that he wanted the equipment back, and Chinchilla did not give defendant a receipt for the equipment. After the seizure of the equipment, defendant never contacted Chinchilla to request the return of the equipment.

¶ 6    Next Agent David Woerner, formerly of the United States Secret Service, testified that while employed with the Secret Service, his duties consisted of providing protection to the president of the United States and other dignitaries and investigating financial crimes, such as identity theft, credit card fraud, and bank fraud. When these duties conflicted, his protection duties took precedence.

¶ 7    In 2013, Woerner was conducting an investigation into defendant based on a tip from an informant that defendant was involved in credit card and tax fraud. The informant also told Woerner that the CPD had executed a warrant on defendant's home. Woerner contacted the CPD and was told that officers had recovered credit card manufacturing equipment from defendant's home, *i.e.*, laptops, embossing machine, credit card reader reencoder, etc. In mid-May or June 2013, Woerner viewed the equipment seized from defendant's home, which was then being stored at the CPD's Homan Square facility. Woerner did not take possession of the equipment at that time, because he did not have the paperwork ready to carry out a transfer of chain of custody.

¶ 8    At the same time that Woerner was investigating defendant, the Internal Revenue Service (IRS) was conducting a similar investigation into defendant. It took some time for the two agencies to determine which of them would take possession of the equipment. During that time, Woerner did not take any steps to obtain a search warrant for the equipment, because he did not want to duplicate or be a nuisance in the IRS's investigation. After it was determined in September 2013 that the IRS would not pursue its investigation of defendant, Woerner proceeded with attempting to gain possession of the equipment. He was notified that the equipment had been moved from the Homan Square facility. It was not clear where the equipment had been moved to, so Woerner requested assistance from Patty Dolton, the CPD's "TASC force officer assigned with the [Secret Service]."[2]

¶ 9    During the time that he was trying to locate the equipment, Woerner continued to pursue other avenues of investigation against defendant, namely, maintaining contact with the informant, conducting standard database searches, and conducting limited surveillance. During

[2]The record does not define the acronym "TASC" or describe the duties of a TASC force officer.

this time, Woerner was also working on three to four federal cases and two to three state cases. He was the only agent assigned to work on these cases. In addition, during 2013, Woerner worked a number of protection assignments, including at the Obama residence in Chicago, which required weeklong assignments. Because of budget issues at the time, Secret Service agents worked a "flex day schedule," which meant that if an agent worked on a weekend, he or she would have to take time off during the week to compensate. When he was not working on another one of his cases and was not working a protection assignment, Woerner was working on his investigation into defendant.

¶ 10    On October 31, 2013, Dolton finally notified Woerner that the equipment had been moved to a bulk storage facility. The following day, on November 1, 2013, Woerner took possession of the equipment. After he had possession of the equipment, Woerner began work on drafting the affidavit in support of a search warrant, which required verifying the machines' serial numbers and identifying all the types of documents the Secret Service sought to recover from the equipment. Woerner testified that he could not have begun his work on the affidavit and complaint for search warrant prior to having possession of the equipment, because he would not have been able to access the necessary information. For example, he testified that he could not have gotten the necessary information during his initial viewing of the equipment, because he would have had to contact banks to verify whether the seized credit cards belonged to the identified individuals and because he would have had to have taken apart some of the machinery to obtain the serial numbers. This was not something Woerner could have done in a warehouse setting. In addition, it was Secret Service policy that any property for which an agent was going to seek a search warrant first had to be in Secret Service custody. Woerner could not delegate the preparation of the application for the search warrant to another agent, because all the other agents had the same busy schedule as him.

¶ 11    In January 2014, Woerner presented his application for search warrant to the trial court. He was not able to do it sooner, because of the difficulty coordinating his, the trial court's, and the State's schedules. Upon execution of the search warrant, Woerner found evidence of credit card numbers and identity theft on the equipment.

¶ 12    To Woerner's knowledge, defendant never asked him or anyone else with the Secret Service for the return of the equipment. Woerner was aware, however, that at the time the equipment was initially seized, defendant requested that the equipment not be taken.

¶ 13    In his argument at the hearing, defendant glossed over his contention that the initial seizure of the equipment was unreasonable. Instead, defendant focused on the reasonableness of the delay in obtaining a search warrant for the contents of the equipment, arguing that the State did not offer a reasonable explanation for the eight-month delay[3] in obtaining the warrant. The trial court agreed with defendant, finding that the primary issue in the case was the reasonableness of the delay in obtaining the search warrant and that the eight-month delay in this case was not reasonable. Accordingly, the trial court granted defendant's motion to

---

[3]We note that the parties and the trial court referred to the delay between the initial seizure of the equipment in May 2013 and the obtention of the search warrant in January 2014 as nine months. According to our calculations, however, there are only eight months between May and January. Ultimately, the difference between eight and nine months does not make a difference in our analysis or the conclusion we reach.

suppress as it pertained to the evidence downloaded from the equipment; all other evidence was to be admitted.

¶ 14  Thereafter, the State filed a timely certificate of impairment and notice of appeal.

¶ 15  II. ANALYSIS

¶ 16  On appeal, the State argues that the trial court erred in granting defendant's motion to suppress evidence, because the delay in obtaining the search warrant was not unreasonable under the circumstances. In the alternative, the State argues that the exclusionary rule should not be applied in this case. We do not find the State's contentions persuasive and affirm the trial court's decision.

¶ 17  There is no dispute on appeal that the initial seizure of the equipment was justified based on probable cause, nor is there any dispute that a search warrant was required before the equipment's contents could be searched. See *Segura v. United States*, 468 U.S. 796, 806 (1984) ("[T]he Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible."). A seizure, although reasonable at its inception, may become unreasonable, however, because of its duration. *Id.* at 812. In other words, once law enforcement officers have seized an item, they must obtain a search warrant within a reasonable time. *United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012).

¶ 18  In determining whether a seizure became unreasonable, we " 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *United States v. Stabile*, 633 F.3d 219, 235 (3d Cir. 2011) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). On the individual's side, the primary concern is with the invasion of the individual's possessory interest in the property, as a seizure does not generally affect an individual's privacy or liberty interests. *Burgard*, 675 F.3d at 1033. The longer that the seizure lasts, the greater the invasion on the individual's possessory interest. *Id.* Delays also affect the integrity of the criminal justice system in that "they prevent the judiciary from promptly evaluating and correcting improper seizures." *Id.* In addition, an individual's assertion of his or her possessory interest in the subject property, *i.e.*, by checking on the status of the procedure or requesting its return, is helpful—although not essential—evidence that the seizure of the property affected the individual's possessory interests. *Id.*

¶ 19  On the other side of the balance is the State's interest. The State's interest is greater in seizures based on probable cause rather than those resting only on reasonable suspicion. *Id.* Thus, greater delays are tolerated in cases involving probable cause seizures than those involving reasonable suspicion seizures. *Id.* The greatest delays, however, will be tolerated in cases where the seizure was based on consent, because such seizures do not infringe the individual's possessory rights. *Stabile*, 633 F.3d at 235.

¶ 20  It is also important to consider the diligence of law enforcement officers in pursuing their investigation. *Burgard*, 675 F.3d at 1033.

> "When police act with diligence, courts can have greater confidence that the police interest is legitimate and that the intrusion is no greater than reasonably necessary. [Citation.] When police neglect to seek a warrant without any good explanation for that

delay, it appears that the state is indifferent to searching the item and the intrusion on an individual's possessory interest is less likely to be justifiable." *Id.*

¶ 21    We will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence, but its decision on the legal question of suppression will be reviewed *de novo*. *People v. Veal*, 2017 IL App (1st) 150500, ¶ 10.

¶ 22    The evidence presented at the hearing on the motion to suppress is undisputed; the parties only dispute the import of those facts on the assessment of the reasonableness of the delay. After reviewing the record, we conclude that the trial court did not err in finding that the eight-month delay in obtaining the search warrant for the contents of the equipment was unreasonable. Here, the delay between initially seizing the equipment and obtaining the search warrant was inordinately long—eight months. This length of delay is far longer than any of the delays found to be reasonable in the cases cited by the parties. See *Illinois v. McArthur*, 531 U.S. 326, 332-33 (2001) (2 hours); *United States v. Johns*, 469 U.S. 478, 487-88 (1985) (3 days); *Segura*, 468 U.S. at 812-13 (overnight); *Burgard*, 675 F.3d at 1034 (6 days); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (11 days). In fact, the longest delay in any of the cases cited by the parties was three months in the case of *Stabile*. *Stabile*, 633 F.3d at 235. Accordingly, we find the length of the delay in this case to be extraordinary. See *Burgard*, 675 F.3d at 1033 ("[T]he 'brevity' of the seizure is 'an important factor' for us to weigh."). Because the delay in this case was so long, the intrusion on defendant's possessory interest in the equipment was quite great. See *id.* ("[A] longer seizure is a greater infringement on possession than a shorter one.").

¶ 23    We also observe that defendant asked the seizing officers to not seize the equipment. This evidenced defendant's possessory interest in the equipment and the effect its seizure had on that interest. *Id.*

¶ 24    On the other side of the balance, we note that the initial seizure was based on probable cause. As the State points out, this evidences a greater interest by the State than if the initial seizure was based on reasonable suspicion. This is, however, but one factor of many to be weighed in the analysis of whether the delay in obtaining a search warrant was unreasonable; it does not automatically justify any delay in obtaining a search warrant.

¶ 25    Finally, with respect to the diligence of law enforcement, we find the diligence lacking in this case. Although we do not believe that the officers and agencies involved in this case completely or intentionally abdicated their duties, we cannot find that the necessary urgency in obtaining a warrant was shown. The equipment was seized on May 13, 2013. There was nothing to stop the CPD from obtaining a warrant immediately, because it already had probable cause. Woerner viewed the equipment either in mid-May or mid-June (his testimony conflicted on this point), after he was informed of the seizure by his informant. There was no evidence that any action was taken by the CPD or any other agency to obtain a search warrant for the equipment prior to Woerner viewing the equipment, nor was there any explanation offered for the lack of action prior to Woerner's viewing of the equipment. Thus, up to a month and a half of the eight-month delay is completely unexplained.

¶ 26    After Woerner viewed the equipment, still no action was taken by Woerner or any other agency to pursue a search warrant until November 2013. Woerner testified that the delay on his part was attributable in part to the fact that, until September 2013, it was unknown whether the IRS would also pursue possession of the equipment. During this time, Woerner did not take any steps to pursue a search warrant because he did not want to duplicate or be a nuisance in

- 6 -

the IRS's investigation. After the IRS determined it would not pursue possession of the equipment, Woerner claimed he could not pursue a search warrant because the equipment could not be located by the CPD. There was no evidence as to why no other agency took steps to secure a search warrant between the time Woerner first viewed the equipment and the time that the CPD located the equipment in its warehouse at the end of October 2013. It does not appear to us that the CPD had any intent of pursuing an investigation into the equipment, and in fact, the State contends that any such investigation would have been outside the CPD's purview. Nevertheless, the CPD continued to hold the equipment.

¶ 27    Nothing during this time period—between Woerner's first viewing of the equipment and October 31, 2013—demonstrates diligence in pursuing a search warrant. Although Woerner continued his investigation into defendant, he did nothing from the time he viewed the equipment until September 2013 (approximately two to three months) to pursue a search warrant, not because he was prevented from doing so, but because he did not want to step on the toes of the IRS. During this time, the CPD also did not take any action to obtain a search warrant. Moreover, during this time, the CPD—whether due to inadequate evidence handling policies, a lack of supervision or training, or inadvertent mistake—was unable to locate the equipment, which added approximately two months to the delay in Woerner obtaining a search warrant. By November 1, 2013, when Woerner finally took possession of the equipment, no action whatsoever had been taken to obtain a search warrant for six months, and the only reasons given were that Woerner did not want to step on the toes of the IRS and the CPD could not locate the equipment.

¶ 28    We pause here to note that the arguments of the State, both in the trial court and on appeal, imply that we should consider only Woerner's actions in determining whether the delay in obtaining the search warrant was unreasonable, because he was the investigating officer, and that the actions (or inactions) of the CPD or other involved law enforcement agencies should not be considered. We disagree. Defendant was deprived of his equipment for eight months pending the obtention of the search warrant. The question before us is whether the total delay of eight months was reasonable. Whether portions of the delay were attributable to Woerner or to the CPD is irrelevant. It would be unfair to conduct an end run around an otherwise unreasonable delay by ignoring portions of the delay because they were caused by a law enforcement agency other than the primary investigating agency. At the end of the day, whether the delay was caused by Woerner or the CPD, the result was the same: defendant's possessory interest in the equipment was invaded by law enforcement for eight months.

¶ 29    After Woerner took possession of the equipment, it took him two months to complete and present his application for the search warrant. According to the evidence, this process was delayed by the fact that Woerner was the only agent working on the case, he had multiple other pending cases, he was required to spend time on his protection duties, his working hours were limited due to budget concerns, and he had to coordinate his schedule with that of the State and the trial court. In *Stabile*, the Third Circuit held that a three-month delay in obtaining a search warrant was justified in part because the lead Secret Service agent on the case was working on multiple other cases and had to perform protection duties. *Stabile*, 633 F.3d at 236. Despite holding that the three-month delay was reasonable, the Third Circuit made it a point to note that the delay was not unavoidable, the court was troubled by the delay, and under different circumstances, it might have reached a different conclusion. *Id.* Even if we were to accept that Woerner's other duties, his limited work hours, and his busy schedule were

reasonable explanations for the two months that passed between the time Woerner took possession of the equipment and the time he obtained the search warrant, they still do not explain the six-month delay that preceded Woerner taking possession of the equipment.

¶ 30    Upon considering all the factors, we cannot agree with the State's claim that the eight-month delay in this case was reasonable under the circumstances. This case involves an extensive delay—one that exceeds by five months the longest delay in all the cases cited by the parties. Defendant asserted his possessory interest in the equipment when he asked on May 13, 2013, that the officers not seize the equipment. Most important in this case is the fact that, during six of the eight months of delay, there was no diligence whatsoever by law enforcement. First, law enforcement did not take any action at all between the equipment's seizure and Woerner's initial viewing of it. After that, until September 2013, no action was taken because of interagency niceties, and thereafter, until November 1, 2013, no action was taken because law enforcement could not find the equipment.

¶ 31    Against our conclusion, the State argues that the invasion of defendant's possessory interest in the equipment was lessened because defendant did not request the return of his property at any point, defendant did not allege that he was harmed by the delay in obtaining the search warrant, and defendant did not have a legitimate interest in the equipment. We disagree. First, as discussed above, although defendant might not have requested the return of the equipment following its seizure, at the time of its seizure, he did request that the equipment not be seized. Moreover, although a defendant's assertion of his possessory interest in the seized property is helpful evidence that the seizure affected his possessory interest, it is not essential. *Burgard*, 675 F.3d at 1033. Further, we agree with the trial court's statement during its oral ruling on the motion to suppress that "if the police or government seizes someone's property, [it is not] up to that individual to constantly beg the government for the property back."

¶ 32    We similarly find that the State's other contentions—that defendant did not allege any harm from the delay and that he did not have a legitimate interest in the equipment—are also without merit. The State has not cited any authority for the proposition that defendant must suffer some tangible harm by the delay or that law enforcement is permitted to hold seized property indefinitely so long as the individual from whom the property was seized does not claim any harm. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (requiring that the argument section of an appellant's brief contain "the contentions of the appellant and the reasons therefor, with citations of the authorities and the pages of the record relied on"); see also *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986) ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research."). As for the argument that defendant did not have or allege a legitimate interest in the equipment, again, the State does not cite any authority for the proposition that defendant was required to demonstrate that he had legitimate uses for the equipment in order to be entitled to relief for an unreasonable delay in obtaining a search warrant. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); see also *Thrall Car Manufacturing Co.*, 145 Ill. App. 3d at 719. Moreover, the State's claim that the forensic scans of the equipment revealed no legitimate uses is entirely conclusory and not supported by any citation to evidence in the record. In addition, it is improper to use the fruits of a search to determine its legality, which is exactly what the State seeks to do by arguing that the search of

the equipment did not reveal any legitimate uses for the equipment. See *People v. Bankhead*, 27 Ill. 2d 18, 20 (1963) ("[T]he legality of a search is not to be determined by its results ***.").

¶ 33    In sum, for all the reasons discussed above, we conclude that the trial court did not err in holding that the balance of the interests here dictated a conclusion that the delay between the seizure of the equipment and the obtention of the search warrant was unreasonable.

¶ 34    The State argues in the alternative that, even if we conclude that the delay in obtaining the search warrant was unreasonable, the exclusionary rule should not be applied in this case. According to the State, the purposes of the exclusionary rule are not served by applying the rule in this case, because the delay in obtaining the search warrant was not the result of any single actor's actions, but rather the culmination of actions of multiple, uncoordinated agencies.

¶ 35    The Constitution does not require the application of the exclusionary rule. *United States v. Espinoza*, 256 F.3d 718, 724 (7th Cir. 2001). The introduction at trial of illegally obtained evidence is not, by itself, a violation of a defendant's constitutional rights. *Id.* Because the indiscriminate application of the exclusionary rule would impede the truth-finding function of the trial system and generate disrespect for the administration of justice, it should be applied only where its remedial objectives are best served. *Id.* at 724-25. The purposes of the exclusionary rule are to "deter illegal police conduct by punishing the behavior and removing the incentive for its repetition." *Id.* at 724.

¶ 36    Defendant argues in response that the State has waived any contention regarding the application of the exclusionary rule by failing to make the argument in the trial court. The State admits that its contention that the exclusionary rule should not be applied in this case was not "extensively made or fully developed" in the trial court. It also argues, however, that, because it argued in the trial court that the evidence should not be excluded and because the question of whether the exclusionary rule applies is closely related to whether the fourth amendment was violated, its argument should not be considered waived. We disagree that the question of whether the delay in obtaining the search warrant was unreasonable is closely related to the question of whether the exclusionary rule should be applied. The analysis applying to each question is entirely different from the other, and the answer to neither question is dependent on the answer to the other. In fact, courts have made clear that "[t]he question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Illinois v. Gates*, 462 U.S. 213, 223 (1983). Accordingly, because the State failed to argue in the trial court that the exclusionary rule should not apply, we agree with defendant that the State waived this contention. See *People v. Capuzi*, 308 Ill. App. 3d 425, 429 (1999) (where the State failed to raise the issue of standing in the trial court during the motion to suppress, it could not raise it for the first time on appeal).

¶ 37    Waiver aside, we are not convinced that the application of the exclusionary rule would be pointless in this case. Although it is true that both the CPD and the Secret Service contributed to the delay in obtaining the search warrant for the equipment, the application of the exclusionary rule here encourages both agencies to improve their practices in cases such as this, namely, better training, better supervision, facilitating better interagency communication and cooperation, and improving property tracking policies and practices.

¶ 38                                    III. CONCLUSION

¶ 39            For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 40            Affirmed.