**Troy P. JAMES, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–1555, 96–CO–1792.**

District of Columbia Court of Appeals.

Argued Feb. 3, 1998.
Decided Oct. 8, 1998.

John Thomas Kenney, appointed by the Court, for appellant.

Danny C. Onorato, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Gary M. Wheeler and Mary T. O'Connor, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and KERN, Senior Judge.

RUIZ, Associate Judge:

After a three-day trial, a jury found appellant, Troy P. James, guilty of four counts of assault with a dangerous weapon ("ADW"), in violation of D.C.Code § 22–502 (1996); one count of possession of a firearm during a crime of violence, in violation of D.C.Code § 22–3204(b) (1996); and one count of destruction of property, in violation of D.C.Code § 22–403 (1996). The trial court

1. D.C.Code § 23–110 (1996).

2. James' previous interactions with Whitmire had resulted in her obtaining a civil protection

sentenced James to concurrent sentences of not less than forty months and not more than ten years' incarceration for each of the ADW convictions, not less than five and not more than fifteen years' incarceration for the possession of a firearm during a crime of violence conviction, and imposed a fine of $300 for the destruction of property conviction. In his direct appeal (No. 94–CF–1555), James argues that 1) three of his ADW convictions should be vacated because they merge as a matter of law; and 2) the trial court erred when it denied his motion for judgment of acquittal because the evidence at trial was insufficient to support a guilty verdict. In his collateral appeal (No. 96–CO–1792), James contends that the trial court erred in denying, without a hearing, his § 23–110 [1] motion alleging ineffective assistance of counsel. With respect to the merger issue, we hold that two of James' four ADW convictions merge as a matter of law, and reverse and remand to the trial court for vacation of two of the ADW convictions. As to the remaining points of alleged error, we affirm.

*The Facts*

Evidence presented at trial showed that on February 3, 1994, at approximately 6:30 p.m., James phoned the complaining witness, Ms. Shannon Whitmire, an ex-girlfriend and the mother of his seven-month-old child, Stefone, to ask her why she had not called to invite him over to spend the night. She replied that she had made plans to take a friend out for her birthday. In addition, she declined his offer to baby-sit Stefone, stating that she "had already made arrangements for the kids to be kept." Throughout the conversation, James insisted that she not go out.[2]

Later that evening, at around 8:30 p.m., Whitmire heard someone calling her name from outside her apartment and "little tapping noises" caused by rocks being thrown at her window which she recognized as James' customary signal to her that he was waiting outside. She immediately called the police. Shortly thereafter, Whitmire heard "bang-

order against him. Whitmire testified that she had renewed the order on the day she testified at trial out of fear for herself and her children.

ing" and "kicking" noises at the back porch door. She again called the police. During both calls she identified James as the man outside her apartment causing the disturbance.

Whitmire called the police yet again when the rock throwing resumed. Upon completing her call, Whitmire received a call from James at a number she recognized as belonging to a pay-phone down the street. James threatened to "come in front of [Whitmire's] house and drink bleach" if she went out. When Whitmire informed him that the police were on their way, James said that he did not care and that he would sit there until they arrived.

The rock throwing then resumed with greater intensity, breaking one of the windows in the living room. In response, Whitmire again called the police—her fourth call. She then looked out the window and saw James standing alone on the sidewalk by the gate of her building. At that point another rock came through the window. Fearing for the safety of her three children, four-year-old Shannika, two-year-old Shante, and seven-month-old Stefone, she moved them into the bedroom. From there, Whitmire heard James banging at the back door, calling out to her and demanding to be let in. After the door banging stopped, Whitmire heard James run down the steps. According to Whitmire, "within a matter of seconds" gunshots were fired, sending two bullets through the bedroom window right above her children's heads.[3] The police arrived shortly thereafter.

## I. Appeal No. 94–CF–1555

James argues that his four ADW convictions should merge as a matter of law. The indictment charged four separate counts of ADW, one count for each of the four individuals in the apartment. At the conclusion of the case, James argued that the counts should be dismissed as to the children because there had been no evidence that James knew the children were in Whitmire's apartment. Although the trial judge was "troubled" by a lack of evidence of a "specific intent to cause any injury to any of the children," he concluded that "behavior that is in conscious disregard to the life and safety" of other people might suffice to cover all four counts. The trial court noted that ADW is a general intent crime, which would be supported by the evidence that appellant "was aware that ... other children were in the home."[4]

James argues that three of the four ADW convictions must be vacated as a matter of law because even concurrent sentences are prohibited for merging offenses. *See Doepel v. United States,* 434 A.2d 449, 459 (D.C.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981). The government counters that this court should affirm two of the ADW convictions because James placed at least two victims at risk of serious injury by firing two bullets. The government relies on *Ruffin v. United States,* 642 A.2d 1288, 1295–96 (D.C.1994), for the proposition that where a defendant fires multiple shots at a group of persons, with the general intent to assault those persons, multiple convictions, equal to the number of shots putting persons at risk, are appropriate.

■ Our review of merger issues is "limited to assuring that the sentencing court does not exceed its legislative mandate by imposing multiple punishments for the same offense." *Ball v. United States,* 429 A.2d 1353,

---

3. There is some discrepancy in the record as to whether two or three gunshots were fired; the police recovered only two bullets from Whitmire's bedroom wall.

4. It appears that at the outset of trial, the government expressed its intention to submit one count of ADW, including all four victims, to the jury. At the conclusion of trial, when James had renewed his motion for judgment of acquittal, the government argued that the case should go to the jury on all four counts to limit potential jury confusion, and avoid unanimity issues. On ap-

peal, James argues that all but one of the ADW convictions should be vacated "as a matter of fairness" because that had been the understanding of the parties and the trial court. Our review of the record indicates that, although the trial court was inclined to believe that all the ADW counts would merge at sentencing, the trial court also indicated that there was sufficient evidence to go to the jury with respect to each of the victims when it denied James'. MJOA. Thus, we perceive no "agreement" that would prevent our addressing the matter as a legal issue.

1358 (D.C.1981) (citing *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)). While the plain language of D.C.Code § 22–502 (1996) does not expressly indicate whether a single act of assault can support multiple convictions,[5] we have held multiple convictions for ADW may be appropriate where the attacker had reason to know that the intended victim was not alone. *See Ruffin, supra,* 642 A.2d at 1296 ("Knowledge of the [others'] presence rather than a particular intent to harm them is sufficient under the circumstances presented here."). We also have determined that "the intentional firing of multiple [ten to fifteen] shots into [a] confined space ... c[an] sustain an assault charge on each occupant ... *even if the assailant did not have actual knowledge that [other people] were present."* *Id.* (emphasis added). Thus, we consider the factual circumstances of each case to determine whether a single act of assault supports multiple convictions.

 In this case, we conclude that the evidence at trial supports two of the four ADW convictions. Specifically, the evidence at trial proved that James knew that Whitmire and her son Stefone were in the apartment. Before firing the shots, James spoke with Whitmire on the telephone at the apartment and called out her name on several occasions. There was also circumstantial evidence that James knew Stefone was in the apartment: James volunteered to baby-sit his son that evening, and Whitmire testified that the children were crying during the attack. Accordingly, two of James' four ADW convictions should be affirmed because he fired two shots and knew of the presence of at least Whitmire and Stefone. *See Gray v. United States,* 585 A.2d 164, 165 (D.C. 1991) (affirming three assault with intent to kill convictions where three shots were fired at three children through a screen door twenty to thirty feet away). We reverse and remand for vacation of the two ADW convictions with respect to Whitmire's two other children, Shannika and Shante.[6]

5. D.C.Code § 22–502 (1996) reads:
Every person convicted of an assault with intent to commit mayhem, or of an assault with a dangerous weapon, shall be sentenced to imprisonment for not more than 10 years.

 James' second point of error in his direct appeal is that the trial court erred when it denied his motion for judgment of acquittal because the government did not present sufficient evidence to convict him of the charged offenses. Specifically, James argues that the evidence was insufficient because there was no eyewitness testimony that he fired the bullets into Whitmire's apartment or that he was even seen with a gun. We review the denial of such motions "in the light most favorable to the government and overturn a conviction *only if* there is *no* evidence from which a jury could find guilt beyond a reasonable doubt." *Curtis v. United States,* 568 A.2d 1074, 1074–75 (D.C. 1990) (citations omitted) (emphasis added). In this analysis, "[w]e do not distinguish between direct and circumstantial evidence." *Ruffin, supra,* 642 A.2d at 1291.

James argues that the trial court erred in denying his MJOA because the evidence, viewed in the light most favorable to the government, establishes at most that James was banging on Whitmire's back door and asking to be let in, but not that he fired the two shots into her apartment. Appellant suggests that this court consider the line of constructive possession cases and apply the principle that mere presence without more is insufficient to establish guilt. He further argues that in order for the government to have met its burden, it had to present some evidence to suggest that no one else was in the alley, that only James had access to the alley, or that no one else had the opportunity to commit the offense.

 Although James is correct in asserting that there was no direct evidence that he actually fired the shots into the apartment, there was significant circumstantial evidence presented by the government from which the jury could infer that James assaulted Whitmire and Stefone with a deadly weapon. The elements of intent-to-frighten assault are that 1) defendant committed a

6. As all sentences for the ADW convictions were identical and concurrent, there is no need for resentencing on the convictions that remain.

threatening act that reasonably would create in another person a fear of immediate injury; 2) when he committed the act, defendant had the present ability to injure another person; and 3) defendant had the intent to perform the act. *See Smith v. United States,* 593 A.2d 205, 206–07 (D.C.1991). The evidence adduced at trial 1) placed James at the scene of the assault; 2) established James' desire to frighten Whitmire so that she would not go out and let him spend the night; 3) demonstrated James' anger and distress at Whitmire's refusal to allow him entry; and 4) linked James spatially and temporally with the gunshots constituting the assault. James' analogy to constructive possession cases is inapposite because the government used circumstantial evidence to show that James' course of conduct indicated motive, opportunity and intent to carry out the assault.[7]

■ Contrary to appellant's argument, the government does not have to prove that no one else had the opportunity to commit the crime. It is enough if the evidence *permitted* the jury reasonably to infer, beyond a reasonable doubt, that James committed the assault. *See Gray, supra,* 585 A.2d at 165 ("The evidence need not *compel* a finding of guilt beyond a reasonable doubt.") (citation omitted). Appellant concedes that the evidence places him at the scene, banging on the door, demanding that he be allowed inside. The jury could have drawn a reasonable inference that James fired two shots into the apartment based on the evidence that earlier he threw rocks into the apartment and that he was adamant about getting into Whitmire's apartment and preventing her from going out. From the inference that James fired the two shots into the apartment it is clear that he had the present ability to injure the occupants of the apartment as the bullets were lodged in the wall of the bedroom where Whitmire and the children were located. Finally, the jury could have determined from the circumstantial evidence that James had the intent to perform the act.

Accordingly, we affirm the trial court's denial of James' motion for judgment of acquittal.

## II. Appeal No. 96–CO–1792

■ James argues that the trial court erred in denying, without a hearing, the § 23–110 motion to vacate his convictions on the ground that his trial attorney provided ineffective assistance of counsel. Ordinarily, we review the denial of § 23–110 motions for abuse of discretion. *See Johnson v. United States,* 633 A.2d 828, 831 (D.C.1993). If, however, the trial court denied the motion without a hearing we "must [be able to] conclude that under no circumstances could the movant establish facts warranting relief" in order to affirm the judgment below. *See Ready v. United States,* 620 A.2d 233, 237 (D.C.1993) (citation omitted).

On September 16, 1994, the trial court held a pre-sentencing hearing to consider James' request for new counsel on the ground that his trial counsel was ineffective because he allegedly did not: 1) investigate, interview, or contact all defense witnesses; 2) regularly visit the jail to update James on the status of his case; 3) provide requested transcripts and motions until the day of trial; and 4) properly advise James of his rights, including the government's plea offer and James' right to testify. James appeared at the hearing *pro se,* and the trial court questioned James and trial counsel about James' allegations. The trial court concluded that there was "no basis for the Court to find that trial counsel's performance was deficient in any way." The trial court also noted that there was no prejudice to James because the evidence against him was "overwhelming". However, the trial court appointed new counsel "for sentencing and other post-sentencing purposes." When the trial court denied James' *pro se* motion claiming ineffective assistance of trial counsel, it did so "without prejudice" to any subsequent motion new counsel might file. James did not appeal the trial court's ruling in his direct appeal.

---

7. The gun was not submitted into evidence. Thus, constructive possession cases are inapplicable here because the government is not making James' proximity to the gun a factor in this case.

The prosecutor relied on evidence other than the gun or James' mere presence to establish the government's prima facie case.

On August 5, 1996, nearly two years later, James filed the § 23–110 motion that is the subject of this appeal. In that motion, he argued that his trial counsel was ineffective because he failed to: 1) adequately consult with James before trial about his defense and the government's plea offer; 2) thoroughly investigate James' case, including contacting James' additional alibi witness, Keith Carter; 3) file a suppression motion and conduct appropriate discovery with respect to Deborah Walton's identification of James; 4) prepare James' alibi witness, Bonita Harper, for cross-examination; 5) discredit Whitmire's credibility by showing her bias, in particular, by offering into evidence the letters Whitmire wrote James while he was incarcerated at Lorton prison; and 6) provide competent legal advice with respect to James' trial, his right to testify in his own defense, and the consequences of refusing the government's plea offer.

In denying James' § 23–110 motion without a hearing, the trial court relied on two principal grounds. First, the trial court concluded that the motion duplicated the issues that were resolved at the 1994 pre-sentencing hearing. *See Vaughn v. United States,* 600 A.2d 96, 97 (D.C.1991) ("[T]he trial court 'shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.'") (quoting D.C.Code § 23–110(e) (1996)). Second, the trial court concluded that the motion "fail[ed] to shed new light on the issue of ineffective assistance of counsel."

A trial court's rulings with regard to allegations of ineffective assistance of counsel present a mixed question of law and fact. *See Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992). We accept the trial court's factual findings unless they lack evidentiary support, but we review its legal conclusions *de novo. See id.* To prevail on a § 23–110 motion alleging ineffective assistance of counsel, the movant must show that 1) trial counsel was deficient and 2) there is a reasonable probability that, but for such deficiency, the outcome of the trial would have been different. *See Spencer v. United States,* 688 A.2d 412, 419–20 (D.C.1997) (citing *Strickland v.*

*Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

Although the trial court previously had heard and denied during the pre-sentencing hearing James' *pro se* claims of ineffective assistance of counsel with respect to most of the issues raised in counsel's § 23–110 motion, James was unrepresented at the hearing and the trial court's denial had been without prejudice to subsequent motions filed by new counsel. Thus, the § 23–110 motion filed by new counsel should not have been denied as "successive." Instead, we affirm the trial court's denial of James' § 23–110 motion filed by counsel on the alternative ground, *see Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986), that the motion was vague and conclusory and, even if its assertions were true, would not entitle James to a new trial. *See Newman v. United States,* 705 A.2d 246, 261 (D.C.1997) ("[T]he trial court's denial of a § 23–110 motion without a hearing [will be affirmed] only if the claims (1) are 'palpably incredible'; (2) are 'vague and conclusory'; or (3) even if true, do not entitle the movant to relief.") (quoting *Gregg v. United States,* 395 A.2d 36, 39 (D.C.1978)).

James complains that trial counsel failed in not communicating "sufficiently" with James before trial. As a result, counsel did not understand James' relationship with the complaining witness,[8] did not communicate or explain the government's plea offer until the day of trial and did not advise James of the possible sentence he could receive if he were convicted. James' contention that his counsel provided him with insufficient plea information is not supported by the record. Not only is this allegation "vague and conclusory," it also fails to specify how James' defense was prejudiced by the delayed communication. In order to claim prejudice, James must show that there is a reasonable probability that he would have pled guilty instead of proceeding to trial if his attorney had properly presented the government's offer. *Cf. Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). James admits that his attorney notified him of the plea agreement and advised

8. *See discussion infra.*

him that a guilty plea would violate the conditions of his probation. James does not claim that had he learned of the plea offer earlier, he would have accepted it.[9] Therefore, the trial court did not err in denying James' motion on this ground.

■ James contends that trial counsel was deficient in his investigation of the case, including his investigation of Keith Carter as a potential alibi witness. We reject this allegation as vague and conclusory.[10]

■ James also argues that defense counsel was deficient in not requesting discovery and filing a suppression motion with respect to the identification by Deborah Walton, Whitmire's neighbor across the street, of James at the crime scene. James offers no reason why Walton's identification should have been suppressed, other than to suggest "the possibility of police suggestivity at the time the witness was located approximately five months after the event." In addition to the conclusory nature of the allegation, we are not persuaded that the failure to file a motion to suppress this identification unduly prejudiced the defense in light of the other substantial evidence that placed James at the crime scene, in particular, Whitmire's unequivocal testimony that James was outside her window and at her back door.

■ James next alleges that trial counsel was deficient because he did not adequately prepare his alibi witness, Bonita Harper, for cross-examination.[11] In particular, James complains that trial counsel was surprised by a calendar produced at trial by Ms. Harper, which became the subject of the government's cross-examination. In light of the trial court's express and supported finding that, even after cross-examination, Ms. Harper remained "a very, very credible witness," we conclude that James suffered no prejudice by this alleged deficiency.

■ Lastly, James contends that trial counsel was deficient because he failed to discredit Whitmire's testimony as biased and to introduce into evidence the allegedly bias-evoking letters that Whitmire sent to James while he was incarcerated at Lorton prison. James complains that counsel had "no theory or evidence as to why [Whitmire] would make a false accusation against him," and that counsel referred to the civil protection order "on his own" and against James' wishes. The record shows that trial counsel attempted to impeach Whitmire's testimony as vindictive, referring to her unhappiness that James was going out with another woman and her action in seeking claims that counsel failed to consult him before trial about the reasons for Whitmire's bias,[12] James fails to point out how any additional information he would have provided on the subject would have led trial counsel to address the bias issue differently. Without determining whether the failure to introduce the letters into evidence was a reasonable tactical choice, *see Parker v. United States,* 601 A.2d 45, 53 (D.C.1991), we conclude that James effectively waived this issue during trial.[13]

9. James did not submit an affidavit in support of his § 23–110 motion.

10. At the pre-sentence hearing, the trial court learned that it had been difficult to reach Mr. Carter before trial, because, according to James, "he was on the run from the police." We note that, at no time, has James filed an affidavit detailing the substance of Carter's testimony. From the record it does not appear that Carter's testimony would support James' alibi defense at the time of the assault, although it would have corroborated Bonita Harper's testimony that James had been at her home earlier in the evening. *See Reaves v. United States,* 694 A.2d 52, 57 n. 6 (D.C.1997). James alleges that counsel was also deficient in failing to investigate the crime scene and to order a copy of the preventive detention hearing statement, without elaborating

on how these actions, even if we assume that they are advisable, would have impacted his trial.

11. Ms. Harper testified on redirect that she and defense counsel had never discussed what her testimony would be at trial.

12. According to the § 23–110 motion, James would have informed counsel that Whitmire and James had more contact than she admitted and that she felt scorned because she had been planning to marry him.

13. The trial court, concerned about the "late-breaking" existence of the letters, conducted an ex parte inquiry to determine whether James approved defense counsel's trial strategy. The following excerpt highlights James' waiver:

COURT: Now, ... these late breaks in developments cause me some concern. I just

James makes various other conclusory allegations that trial counsel failed to advise him of his rights, including the right to testify. Specifically, James claims that it was counsel's decision, not James', that he not testify.[14] This claim is belied by the record, which shows that, after trial counsel notified the court that James had changed his mind and wished to testify, the trial court conducted a colloquy with James advising him of his "personal" right to testify, which James expressly turned down.[15]

We conclude that James' § 23–110 motion alleged no circumstance which warranted re-

lief and accordingly affirm the trial court's denial of the motion for new trial. *See Ready, supra,* 620 A.2d at 237.

*Affirmed in part; reversed and remanded in part.*

---

wonder if there is any question, Mr. James, in your mind about whether or not Mr. Stow has represented you to the best of his ability.

JAMES: Yes, I feel like he has represented me to the best of his ability. Yes.

. . .

COURT: If you wish to voice any complaints at this time I will listen to them, otherwise we will get in gear and get back to trial.

JAMES: You mean complaints as far as my case?

COURT: Yes.

JAMES: The only complaint I have is Shannon Whitmire states that I am the father of the child. . . .

14. Apparently, James was ambivalent about whether he should testify. When he met with counsel on a Sunday, he felt he should testify, but, according to the § 23–110 motion, felt "overwhelmed by counsel" who "threw his file on the table and said that if he was the defendant, he would not testify." Early the next

morning, counsel received a call from Ms. Harper that James had decided he would testify. Counsel discussed the matter with him later that day at the holding cell, at which time, according to the § 23–110 motion, James was again "pressured" by counsel not to testify.

15. COURT: In this case you presented evidence, but if you choose not to present any testimony, that is your right. But it is a personal right. It is not a decision [defense counsel] can make. He can only advise you of matters of tactic and strategy. You have to make your own decision whether you wish to testify or not.

Do you have any questions about this?

JAMES: No.

COURT: Then would you tell me what your decision is?

JAMES: No, I am not going to testify.

COURT: Is this your decision or is this something you feel you are being forced to do?

JAMES: No, it is my decision.

COURT: All right.