**Ronald C. ARTIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 96–CF–138, 00–CO–849.**

District of Columbia Court of Appeals.

Argued Nov. 5, 2001.
Decided July 18, 2002.

---

Theodore M. Cooperstein and, on the supplemental brief submitted after oral argument, Brian C. Plitt, Washington, DC, for appellant.

Rhonda T. Redwood, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Kenneth C. Kohl, Assistant United States Attorneys, were on the briefs, for appellee.

Before RUIZ, GLICKMAN, and WASHINGTON, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Ronald C. Artis was convicted of first degree murder while armed, two counts of assault with intent to kill while armed, conspiracy to commit those crimes, and related firearms offenses. The trial judge denied his motion for a new trial pursuant to D.C.Code § 23–110 (2001) without a hearing. In this consolidated appeal, we uphold that denial and affirm Artis's convictions. The main issue before us is whether Artis's trial counsel was constitutionally ineffective in failing to move to suppress murder weapons and ammunition recovered by the police when they searched Artis's home in his absence. Artis contends that his counsel should have investigated the circumstances of the search and then moved to suppress this evidence on the grounds that the police (1) invited a television news crew to observe the search without judicial authorization and for no legitimate law enforcement purpose, (2) violated the so-called "knock and announce" rule when they forcibly entered his residence, (3) did not obtain the warrant authorizing the search until after they conducted it, (4) used excessive force in

restraining members of his family who were present during the search, and (5) did not file a timely warrant return in court following the search.

In denying a new trial, the trial judge concluded that Artis was not prejudiced by his counsel's failure to move to suppress the weapons and ammunition because the other evidence of his guilt was overwhelming, and alternatively, Artis had not shown that a motion to suppress evidence likely would have been granted. We affirm on the latter ground, though our reasons diverge from those of the trial court. First, the fact that a television news crew accompanied the police (and videotaped part of the search for later broadcast), arguably in violation of the Fourth Amendment, did not provide a reason to exclude evidence that the police found and seized themselves without the news crew's assistance. Second, Artis did not have standing to raise a knock and announce violation, as he was absent from the scene when the violation allegedly occurred, and he sustained no injury from the property damage that the police caused when they entered by breaking down his front door. Third, Artis's claim that the police obtained their search warrant only after searching his residence was conclusory, unsupported, and at odds with the record. Fourth, Artis did not have standing to complain about police use of allegedly excessive force against others, nor was that a ground on which to exclude evidence found in an otherwise lawful search. Fifth, the failure of the police to file a timely return in court also did not provide a ground on which to exclude evidence, at least absent a credible claim by Artis that he was prejudiced by the delay.[1]

1. Although Artis alleges as a separate basis for ordering a new trial that his counsel was ineffective in failing to conduct an adequate pretrial investigation which would have

prompted him to file a motion to suppress evidence on these grounds, our determination that no such motion would have succeeded renders this allegation moot.

## I.

*The Evidence at Trial*[2]

According to the government's evidence, the drive-by shooting for which Artis was on trial was a not atypical episode in the hostilities between rival street gangs in the Northeast quadrant of the District of Columbia in 1992. In these hostilities, the Rosedale crew, led by Artis, was allied with the E Street crew against their common enemy, the 15th and Duncan Streets crew.

In July of 1992, someone believed to be a member of the 15th and Duncan Streets crew shot Artis in the chest. Members of the Rosedale crew testified at trial that Artis vowed revenge. Another government witness, affiliated with the E Street crew, testified that Artis also was "real mad" at the 15th and Duncan Streets crew for killing one of his friends and seriously wounding another.

Three months later, on the afternoon of October 16, 1992, members of the 15th and Duncan Streets crew were playing craps at the intersection of those two streets when a yellow station wagon drove up and its occupants opened fire. The shooters killed one crew member and injured two others.

Members of the Rosedale and E Street crews, including the driver and shooters in the station wagon, testified that it was Artis who orchestrated the shootings earlier in the afternoon from a neighborhood crack house. These witnesses said that it also was Artis who supplied the weapons for the mission: a nine millimeter handgun which he removed from his waistband, and a pump shotgun and a .45 caliber pistol, both of which he retrieved from a hole in the ground near a fence in the backyard of his family residence. One of the E Street crew witnesses testified that he rode in the station wagon and fired a full clip (seventeen shots) from the nine millimeter gun at the 15th and Duncan Streets crew members. Another witness said he fired the .45 caliber pistol once before it jammed. No one actually fired the shotgun. After the shooting, the driver of the station wagon returned the weapons to the hiding place by the fence in Artis's backyard. The shooters then reported back to Artis at the crack house.

A Rosedale crew member who testified that he was with Artis at the time of the shooting identified three government exhibits, a nine millimeter handgun, a shotgun and a .45 caliber pistol, as the same weapons Artis had distributed on October 16, 1992. Police officers testified that they had seized the nine millimeter handgun along with nine millimeter ammunition in a search of Artis's home during the early morning hours of November 6, 1992. During the same search, the police recovered the shotgun from the hole by the fence in the backyard. The police seized the .45 caliber pistol in a separate search of the crack house where Artis planned the shooting. A police firearms examiner testified that two bullets removed from the body of the murder victim, as well as shell casings and fragments found at 15th and Duncan Streets, were fired from the nine millimeter handgun. Moreover, according to the examiner, the ammunition seized at Artis's home was the same brand as the shell casings and fragments recovered at the crime scene. Additionally, the examiner testified that a shell casing which the police found after the shooting in an abandoned yellow station wagon four blocks away from 15th and Duncan Streets was fired by the .45 caliber pistol.

---

**2.** Artis's first trial, in 1994, ended in a mistrial. We summarize the evidence at his September 1995 retrial, in which the jury found him guilty. At this trial, the only witnesses were those the government called.

The police witnesses testified that they searched Artis's residence on November 6, 1992, pursuant to a search warrant. Because they were looking for weapons, the police executed the warrant at 5:00 a.m., in the hope that the occupants would be asleep. When they arrived, the officers knocked on the front door, announced "police," waited twenty to thirty seconds without hearing a response, and then broke down the door with a battering ram. While Artis himself was not home, other members of his family were present. A television news crew, having been alerted by someone to the imminent execution of the warrant, accompanied the police to the scene. The news crew remained outside the house and videotaped the recovery of the shotgun in the backyard.

### The Motion to Set Aside the Convictions

Artis was sentenced in December 1995. He filed a timely notice of appeal. In 1999, this court granted Artis's motion to stay his appeal while he litigated a motion in the trial court to set aside his convictions pursuant to D.C.Code § 23–110. In that motion, Artis charged that his trial counsel was constitutionally ineffective, mainly in not moving to suppress the evidence seized from his home on November 6, 1992, on the grounds mentioned above.[3] According to the affidavits of his parents which Artis submitted in support of his motion, his father was awake when the police arrived at their home, and the police did not knock or announce their presence before they broke in. After they entered, the officers allegedly moved Artis's parents, their three daughters and their baby grandson into the living room, where Mr. Artis and two of his daughters were kept with their hands uncomfortably cuffed behind their backs for about two hours, until the search was completed. The Artises did not learn that a television crew was outside during the search until afterward, when friends told them that their house and yard were on the news. (In his motion papers, Artis proffered that the broadcast showed the police reenacting their discovery of the shotgun in his backyard.) No one showed the Artises a search warrant until two hours after the search was over, when an officer returned, handed the warrant to Mrs. Artis, and left. Finally, both Mr. and Mrs. Artis averred that their son's trial counsel never asked them about the November 6, 1992 search of their residence.

The trial court denied Artis's motion without a hearing. It ruled that the allegedly deficient performance of his trial counsel did not prejudice Artis because the weapons and ammunition discovered at his home "merely corroborated the already massive evidence of his guilt" that the government had presented. The court acknowledged that the key government witnesses who furnished this evidence were members of the Rosedale and E Street Crews whose credibility the defense had vigorously challenged. Among other things, the witnesses themselves admittedly were involved in the October 16, 1992 shootings and in other gang violence, most had received favorable plea deals in exchange for their testimony against Artis, many were impeached with prior inconsistent statements, including statements under oath, and several had reason to be angry with Artis. The court nonetheless concluded that there was no reasonable probability that Artis would have been acquitted even if the evidence seized from his home had been suppressed.

Alternatively, the trial court found no prejudice because the evidence seized from

---

3. Artis also claimed that his trial counsel was ineffective in not questioning prospective jurors about their exposure to pretrial publicity and in other respects. We address these claims separately below.

Artis's home likely would not have been excluded on the grounds he advanced if his counsel had made the motion. The court reasoned that the media presence during the search of Artis's home would not have led to suppression because it occurred seven years before the Supreme Court first held that such media participation violated the Fourth Amendment. Regarding Artis's claim that the police did not knock and announce their presence before they broke in, the court noted that at trial the police had testified otherwise. If the claim had been raised in a motion to suppress evidence, the court said, "this would merely have created a credibility issue ... [that] may very well have been decided adversely to the defendant." The court dismissed as "speculation" Artis's assertion that the police carried out their search of his residence before they obtained the search warrant.[4] The court discounted Artis's claim that the police mistreated members of his family by handcuffing them behind their backs, as such restraints could be considered a reasonable safety measure in the context of a search for murder weapons. Lastly, the court thought that the police officers' tardiness in waiting seven weeks to file the search warrant return with the court "in all likelihood would have been deemed a technical

defect ... not warranting suppression of the items seized."

## II.

We have before us both Artis's direct appeal from his convictions and his appeal from the denial of his § 23–110 collateral attack. In his direct appeal, Artis argues for reversal on the straightforward ground that the murder weapons and ammunition taken from his home should have been suppressed on the grounds just stated. We are precluded from considering this argument on direct appeal, however, because Artis did not move for suppression on those grounds before trial. Objections to the admission of evidence are waived when they are not raised in a pretrial motion to suppress the evidence, "unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." D.C.Code § 23–104(a)(2) (2001). *See also Simpson v. United States,* 576 A.2d 1336, 1337 (D.C.1990); Super. Ct.Crim. R. 12(b)(3), (d). Artis had the opportunity to move to suppress,[5] and he either was aware of his grounds or should have been aware of them through reasonable inquiry into the facts and the law.[6]

---

4. On a related point, the court observed that a police affidavit contradicted Mrs. Artis's averment that no officer displayed a search warrant during the search. "This, too," the court said, "presented a credibility issue that may have been decided either way had it been raised during a suppression hearing."

5. In fact, Artis's trial counsel did move, unsuccessfully, to suppress the shotgun, but solely on the ground that the search of the backyard was outside the scope of the search warrant. Artis has not pursued that ground on appeal.

6. It is true that the application of the Fourth Amendment to gratuitously intrusive media ride-alongs during the execution of search

warrants was not "clearly established" at the time of Artis's trial in 1995. *Wilson v. Layne,* 526 U.S. 603, 615–16, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). By 1995, however, at least one federal court of appeals squarely had held it a violation of the Fourth Amendment for law enforcement agents to invite media representatives to accompany them on searches if the media presence is not authorized by the warrant and is not in aid of its execution. *Ayeni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994) (footnote omitted); *see also Bills v. Aseltine,* 958 F.2d 697, 704–05 (6th Cir.1992) (discussing the presence during a search of a private party whose presence was unrelated to assisting in the execution of the warrant).

This brings us to Artis's Sixth Amendment ineffective assistance of counsel claim, which he presented in his § 23–110 motion, and which he has not waived. Artis principally argued that his trial counsel's failure to raise his search and seizure claims in a timely motion to suppress constituted deficient performance that prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Elaborating on the *Strickland* standard, the Supreme Court held in *Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Accord, Hockman v. United States,* 517 A.2d 44, 51 (D.C.1986) (stating that "the failure to file a *meritorious* suppression motion can constitute ineffective assistance of counsel if the failure constitutes performance below an objective standard of reasonableness under prevailing professional norms") (emphasis added). In this case, the trial court determined that Artis did not show either merit in his evidence suppression claims or a reasonable probability that the verdict would have been different without the evidence seized from his home. The court made these determinations and denied Artis's § 23–110 motion without holding an evidentiary hearing, which is within the court's discretion provided that the existing record is adequate or "the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Ready v. United States,* 620 A.2d 233, 234 (D.C.1993). In reviewing these rulings, "we yield to the trial court's factual findings when supported by the record, but review its legal conclusions de novo." *Woodard v. United States,* 738 A.2d 254, 257 (D.C.1999) (citation omitted).

Although our reasons differ in some respects from those of the trial court, we affirm the court's denial of Artis's ineffective assistance claim without a hearing. *See, e.g., James v. United States,* 718 A.2d 1083, 1089 (D.C.1998) (affirming denial of a § 23–110 motion on an alternative ground); *Alston v. United States,* 518 A.2d 439, 440 n. 2 (D.C.1986) ("It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court."). We conclude that Artis would not have been entitled to exclusion of the evidence based on the grounds he now advances even if his trial counsel had raised them in a timely motion to suppress. We therefore need not reach the question of whether the jury verdict would have been the same had the trial court granted such a motion.

### A.

We first address Artis's claim that his trial counsel should have moved to suppress the weapons and ammunition seized from his residence because a television news crew was present to observe the search.

In 1999, the Supreme Court held that "it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Wilson,* 526 U.S. at 614, 119 S.Ct. 1692. The full sweep of this holding remains to be seen, but it surely applies as well to entries onto grounds appurtenant to a home, such as the backyard in this case. *See Hanlon v. Berger,* 526 U.S. 808, 809–10, 119 S.Ct. 1706, 143 L.Ed.2d 978

(1999) (per curiam) (remanding in light of *Wilson* where media crew joined law enforcement agents in search of 75,000–acre ranch).

As the matter was not explored in an evidentiary hearing, the precise extent of the media intrusion on Artis's domestic privacy is not clear. By all accounts the television news crew stayed outside and did not enter into Artis's home. Less certain is the extent of intrusion by the news crew into Artis's backyard, where the police retrieved a shotgun from a hiding place near the fence. At Artis's first trial, an officer testified that a member of the news crew entered the backyard. There is no dispute that the news crew videotaped the search that occurred there, and the tape was broadcast on the local news. There also is no dispute that the news crew's presence did not aid the execution of the warrant and was not judicially authorized. For present purposes we assume that Artis did allege sufficiently a Fourth Amendment violation under *Wilson*. Although the search occurred before *Wilson* was decided, Artis still could have claimed the benefit of *Wilson's* Fourth Amendment holding at his trial and, if need be, on direct appeal. *See Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (applying retroactively to all cases "pending on direct review or not yet final" new rules regarding the conduct of criminal prosecutions even if the rule is "a clear break" with the past).

 It does not follow from this that Artis would have been entitled upon timely motion to suppress the evidence seized from his home or even just from his backyard. "Whether the exclusionary sanction is appropriately imposed in a particular case ... is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *United States v. Leon,* 468 U.S. 897, 906,

104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (internal quotation marks and citation omitted). "[T]he connection between police misconduct and evidence of crime may be sufficiently attenuated to permit use of that evidence at trial." *Id.* at 911, 104 S.Ct. 3405. *Wilson* itself arose in a civil damages action rather than a criminal prosecution, and the case did not address the applicability of the exclusionary rule. In a suggestive footnote, however, the Court emphasized that "if the police are lawfully present, the violation of the Fourth Amendment is the presence of the media and not the presence of the police in the home." *Id.* at 614 n. 2., 119 S.Ct. 1692 The Court added that it had "no occasion ... to decide whether the exclusionary rule would apply to any evidence discovered or developed *by the media representatives.*" *Id.* (emphasis added). The Court said nothing about excluding evidence discovered or developed by the police. This suggests that in "unlawful media presence" cases, the exclusionary rule might be held to apply to evidence that media representatives helped recover, but not to evidence that the police lawfully recovered without media help. That distinction makes sense to us, and we adopt it. Exclusion is a sanction that is applied only to evidence that was acquired through unconstitutional means. *See Leon,* 468 U.S. at 910, 104 S.Ct. 3405 ("Standing to invoke the [exclusionary] rule has thus been limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct.") Evidence that was not so acquired is not excludable merely because it was recovered in the neighborhood of a Fourth Amendment violation. *Accord, United States v. Hendrixson,* 234 F.3d 494, 496–97 (11th Cir.2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 356, 151 L.Ed.2d 269 (2001) (holding that evidence would not be subject to exclusion where unlawful media presence did not expand scope of police

search beyond that allowed by the terms of the warrant or otherwise facilitate the search).[7]

■ Although Artis alleged that the police invited a television news crew to join them when they searched his home and backyard, he did not allege that the news crew helped the police to recover the weapons and ammunition that they found there. According to the uncontradicted testimony of the police at trial, they recovered that evidence on their own. Without any suggestion to the contrary, the media presence alone would not have entitled Artis to the remedy of exclusion even if his trial counsel had filed a timely motion to suppress.

### B.

We turn to Artis's claim that his trial counsel should have moved to suppress the evidence seized from his home because the police broke in without first knocking, announcing their presence, and being refused admittance.

■ "[T]he Fourth Amendment incorporates the common-law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin,* 520 U.S. 385, 387, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (citing *Wilson v. Arkansas,* 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)). "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards,* 520 U.S. at 394, 117 S.Ct. 1416.[8] Artis supported his claim of a knock and announce violation with affidavits from his parents. As the trial court denied his § 23–110 motion without an evidentiary hearing, we must assume that Artis might have established a Fourth Amendment violation under *Richards* and *Wilson.*[9]

■ "It has become established in our jurisdiction that evidence obtained [by way of a knock and announce violation] may be suppressed on motion by a defendant with standing to challenge the violation." *District of Columbia v. Mancouso,* 778 A.2d 270, 272 (D.C.2001).[10] If Artis had stand-

---

7. As the Eleventh Circuit noted, while the "central goal" of the exclusionary rule is deterrence, alternative means exist and have been employed to deter unconstitutional media ride-alongs: "for example, *Bivens* actions against federal law enforcement officers and Section 1983 actions against state officers." *Hendrixson,* 234 F.3d at 497 n. 4.

8. The knock and announce rule also is embodied in 18 U.S.C. § 3109, which applies to the execution of search warrants in the District of Columbia by D.C.Code § 23–524(a) (2001). In *United States v. Ramirez,* 523 U.S. 65, 73, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998), the Supreme Court held that the requirements of Section 3109 are coextensive with the common law rule and exceptions articulated in *Richards* and *Wilson.*

9. The trial court erred in basing its rejection of Artis's claim on the ground that a court

hearing his suppression motion might have believed the police officers rather than Mr. and Mrs. Artis. Where the outcome of a § 23–110 motion turns on the credibility of the opposing witnesses, an evidentiary hearing is required to decide it. *See Newman v. United States,* 705 A.2d 246, 261 (1997). As it happens, moreover, a court that credited the police still could have found that they violated the knock and announce rule by resorting to the battering ram at 5:00 in the morning after waiting only twenty to thirty seconds, a span of time that this court has deemed too short, in the middle of the night, to signify that admittance was being refused. *See Griffin v. United States,* 618 A.2d 114, 121–23 (D.C. 1992).

10. The Supreme Court has not yet settled whether and to what extent the exclusionary rule applies to knock and announce violations. *See Wilson,* 514 U.S. at 937 n. 4, 115

ing, therefore, his trial counsel might have moved prior to trial to suppress on knock and announce grounds, and the trial court might have granted the motion and suppressed the handgun and ammunition found in his living room (though presumably not the shotgun found in his backyard).

Whether Artis had standing to challenge a knock and announce violation is an open legal question, however. Artis was not at home when the police conducted their search. Nor, unlike the appellant in *Mancouso*, was Artis in the immediate vicinity when the police came to call. *See id.* at 274–75 (holding that a resident within "earshot" and "eyeshot" of the premises who could have admitted police upon their request had standing to challenge knock and announce violation). Neither the Supreme Court nor this court heretofore has decided whether a defendant who was not on the scene at all has standing to complain of a "no-knock" entry. Courts in other jurisdictions have split on the question, with most concluding that the absent defendant generally is without standing.[11] In his treatise on the Fourth Amendment, Professor LaFave sides with the majority on this score. *See* Wayne R. LaFave, Search and Seizure § 11.3(a) (3d ed. & 2002 Supp.). We now reach the same conclusion.

■ Our reasoning starts with the basic proposition that "the 'rights assured by the Fourth Amendment are personal rights, [which] ... may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.'" *Rakas v. Illinois,* 439 U.S. 128, 138, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (quoting *Simmons v. United States,* 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). *See also United States v. Payner,* 447 U.S. 727, 735, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) ("Our Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices."). The determination of whether a defendant has standing to challenge a Fourth Amendment violation therefore merges with the "determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas,* 439 U.S. at 140, 99 S.Ct. 421. Accordingly, we must examine what interests the knock and announce rule protects, and whether those interests are held by a resident who is absent at the time of entry.

S.Ct. 1914 (declining to address arguments "that any evidence seized after an unreasonable, unannounced entry is causally disconnected from the constitutional violation and that exclusion goes beyond the goal of precluding any benefit to the government flowing from the constitutional violation"). *Cf. United States v. Espinoza,* 256 F.3d 718, 727–29 (7th Cir.2001) (holding exclusion of evidence a disproportionately severe sanction for a knock and announce violation that did not cause actual harm to defendant's interests).

11. Cases holding that the absent defendant lacked standing to challenge compliance with knock and announce requirements include

*Mena v. Simi Valley,* 226 F.3d 1031, 1035 n. 2 (9th Cir.2000); *United States v. Valencia–Roldan,* 893 F.2d 1080, 1081 n. 1 (9th Cir.1990); *Righter v. State,* 704 A.2d 262, 265–67 (Del. 1997); *State v. Johnson,* 716 P.2d 1006, 1010 (Alaska Ct.App.1986); and *State v. Papineau,* 146 Ariz. 272, 705 P.2d 949, 950 (Ct.App. 1985). *See also United States v. DeLutis,* 722 F.2d 902, 908 (1st Cir.1983) (expressing "serious doubt" about absent owner's standing). But see *People v. Hoag,* 83 Cal.App.4th 1198, 100 Cal.Rptr.2d 556, 559–61 (2000), and *Mazepink v. State,* 336 Ark. 171, 987 S.W.2d 648, 651–52 (1999), in which the courts upheld standing on the part of absent defendants.

The interests protected by the knock and announce rule are important but limited. The rule is not designed to protect the privacy of the home or the interests of all who reside there in preserving that privacy even in their absence. At some level the rule may "symbolize[] the respect for individual privacy summarized in the adage that 'a man's [or woman's] house is his [or her] castle,'" *Mancouso*, 778 A.2d at 273 (citations omitted), but as we explained, "[w]here the police hold a valid warrant, the classic privacy interest of the resident is going to be validly invaded in any event." *Id.* at 274. What knocking and announcing does is to warn those persons who are present to prepare themselves for a lawful police intrusion and to open the door and peaceably admit the police. This serves to protect (1) the interest in avoiding needless shock, fright, embarrassment and violence that might be caused by an unannounced entry, and (2) the interest in avoiding physical damage to property (i.e., the door, typically) that might be caused by an unannounced entry accomplished with force. *See Richards*, 520 U.S. at 393 n. 5, 117 S.Ct. 1416; *Wilson*, 514 U.S. at 935–36, 115 S.Ct. 1914; *Mancouso*, 778 A.2d at 273 and 273 n. 8.[12] If the police enter without warning in violation of the Fourth Amendment, they infringe the first interest. If the police break down the door to do so, they infringe the second interest. The first interest is at stake only for persons who are on the scene (mainly persons who are inside the home, but also residents who are just outside) when the police arrive.[13] The second interest is at stake primarily for persons who have a property interest in the premises (mainly the owner or lessee, but also other persons responsible for keeping up the property). Because these persons have substantial interests at stake, they have standing to complain of a no-knock entry. In *Mancouso*, for example, we upheld the appellant's standing to challenge a knock and announce violation, though he was not at home when the police entered, because he was still within "earshot and eyeshot" and could have "effectuated a peaceful entrance," thereby avoiding the risk of both violence and "unnecessary damage to his property." 778 A.2d at 274.

On the other hand, a resident does not have standing to complain if he was away from the scene entirely, did not have a proprietary interest in the property, and had little or nothing at stake when the police made a forcible entry without first knocking and announcing their presence. Thus, we largely agree with Professor LaFave that "a family member lacks standing when the illegality was merely failure to follow the knock-and-announce procedures of the Fourth Amendment, if that person was absent at the time of the entry—and, if the unannounced entry caused damage to the premises, that per-

---

**12.** Citing *Richards* and *Wilson*, the Seventh Circuit in *Espinoza* listed the interests served by the knock and announce rule as follows:

The individual privacy interests underlying the Fourth Amendment's knock and announce requirement, as identified by the Supreme Court, are: (1) the opportunity for individuals to comply with the law and peaceably permit officers to enter the residence; (2) avoiding the destruction of property occasioned by forcible entry; and (3) the opportunity for individuals to "prepare themselves" for entry by law enforcement officers by, for example, "pull[ing] on clothes or get[ting] out of bed."
*Id.*, 256 F.3d at 723 (citations omitted).

**13.** *Accord*, LaFave, *supra* ("[C]ertain kinds of Fourth Amendment requirements are intended exclusively for the benefit of those present at the time of the police activity, and as to violation of such requirements an absent occupant or owner would lack standing. Such is the case, for example, as to violations of the knock-and-announce rule not involving damage to the premises . . . .") (citations omitted).

son does not contribute to the maintenance of the premises." LaFave, *supra* (citations omitted). *Accord, Righter v. State*, 704 A.2d at 266 (holding that absent defendant lacks standing to challenge forcible entry in violation of knock and announce rule where he was "not the owner of the property and only claims a property interest as an occupant of a bedroom in his mother's home," and where there was "no evidence that he ever paid rent or contributed towards the maintenance of the residence").

▇▇▇ Artis was in the same position as the defendant in *Righter*. He was not on the scene when the police entered his home, he was not the owner of the premises, and he was not responsible for its upkeep. He did not have a substantial interest that was infringed by the alleged no-knock entry in this case. Artis argues that he nevertheless had an interest in having a working front door whenever it was that he did return home after the search, even if he was not the owner of the property and had no obligation to make repairs. We think that for standing purposes, that interest alone is too slight to be deemed substantial. We conclude that Artis did not have standing to challenge police compliance with the knock and announce rule in a motion to suppress evidence seized from his home. He therefore would not have been entitled to the exclusion of that evidence even if his trial counsel had filed the motion.

### C.

The other grounds for suppression that Artis identifies do not require much discussion. It is certainly true "as a basic principle of Fourth Amendment law[,] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (internal quotation marks omitted) (quot-

ing *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). And there is no question that Artis had standing, as a resident, to challenge a warrantless search of his home in his absence. But Artis's assertion—the trial court aptly called it "speculation"—that the police searched his house first and only obtained a warrant afterward was too conclusory and unsupported to merit an evidentiary hearing. The mere fact that the police executed the search as early as 5:00 a.m. is no basis for supposing that they had not obtained a warrant even earlier that same morning. To the contrary, although *Artis* considers it "most unlikely" that a Superior Court judge could have been available to approve the warrant in the hours between midnight and 5:00 a.m. on November 6, 1992, the affidavit in support of the warrant bears a handwritten notation referring to an administrative "approval by phone" at 2:40 on that date, and there was ample time between then and 5:00 a.m. to obtain the required judicial authorization. Moreover, at trial the police officers who carried out the search testified without contradiction that they were executing a search warrant when they did so. The additional facts to which Artis points—that the police allegedly did not show his family the warrant until two hours after the search was concluded (i.e., around 9:00 a.m.) and did not file the return in court until seven weeks after the search—may be consistent with his allegation, but they do not substantiate it.

▇▇▇ Artis's claim that the police used excessive force during the search by handcuffing members of his family with their hands behind their backs fares no better, for it "would not merit relief even if true." *Ready*, 620 A.2d at 234 (citations omitted). We accept that "[t]he general touchstone of reasonableness which governs Fourth Amendment analysis ... governs the

method of execution" of a search warrant, *Ramirez*, 523 U.S. at 71, 118 S.Ct. 992 (citation omitted), and so might be implicated by the unreasonable use of force against bystanders in the course of the search. But Artis lacked standing to complain of the police use of force against persons other than himself; in any event, no evidence was excludable on that ground because no evidence was recovered by means of that alleged illegality. *Cf. id.* ("Excessive or unnecessary destruction of property [or, by analogy, use of force,] in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search not subject to suppression.").

▬▬ Finally, it is true that the police unaccountably waited seven weeks to return the search warrant to Superior Court. This delay contravened D.C.Code § 23–524(d) (2001), which requires that copies of the warrant and the return [14] be filed "on the next court day after" the warrant is executed. *See also* Super. Ct.Crim. R. 41(f) (same). Nonetheless, the delay was a non-constitutional defect that, at least in the absence of any prejudice, would not have justified the suppression of evidence that was seized lawfully from Artis's home. *See United States v. Gerald*, 303 U.S.App. D.C. 311, 315, 5 F.3d 563, 567 (1993) (holding five-month delay in filing warrant and return a "ministerial error" that did not call for exclusion of evidence); *United States v. Motz*, 936 F.2d 1021, 1025 (9th Cir.1991); *see also Criales v. United States*, 621 A.2d 374, 378 (D.C.1993) (quoting *United States v. Burke*, 517 F.2d 377, 386–87 (2d Cir.1975) (holding that in general, non-constitutional violations of Rule 41 "should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule")).[15] The delay in this case did not prejudice Artis. We particularly note that the police did furnish a copy of the warrant to his family on the day of the search (either during the search or a couple of hours later), and Artis does not claim that the police neglected to include the return with it, as they were required to do by D.C.Code § 23–524(c)(3) and Super. Ct.Crim. R. 41(e)(4). Nor does Artis claim that there were any inaccuracies in the return, either as given to his family or as ultimately filed in court. Artis suggests only that the lengthy delay before filing might have facilitated concealment of the alleged fact that the police conducted the search of his home before the search warrant was issued. This suggestion of prejudice adds nothing to the latter allegation, which we have dismissed as being without foundation.

In sum, Artis would not have been entitled to prevail on a motion to suppress evidence on the grounds he has identified. Artis therefore cannot prevail on a claim that his trial counsel was constitutionally ineffective in failing to litigate such a motion.

---

14. The return sets forth the time of the execution of the search warrant and an inventory of the property seized under it. *See* D.C.Code § 23–524(c)(1) (2001); Super. Ct.Crim. R. 41(e)(4).

15. The second prong of the *Burke/Criales* test—whether, apart from any prejudice to the defendant, the disregard of Rule 41 was "intentional and deliberate"—appears to be more applicable to violations that preceded or accompanied the execution of the search warrant than to violations that were committed afterward. It is difficult to see why a court ever should suppress lawfully seized evidence because of non-prejudicial police misconduct that occurred *after* the fact. Even if we allow for that possibility, however, Artis points to no indication that the delay in this case was "intentional and deliberate."

### D.

■ Artis contends that his trial counsel was ineffective in other respects, *see* n. 3, *supra*, notably in not questioning prospective jurors about their exposure to pretrial publicity about him. This claim is insubstantial. In addition to the television broadcast in 1992 regarding the search at his home, Artis points to a handful of newspaper articles that appeared between December 1992 and July 1994. All the news accounts thus occurred more than one year, and in some instances more than two years, before Artis's September 1995 trial. Some of the articles did mention the present case, but they mainly reported on Artis's suspected involvement in another homicide that occurred in 1992. Although the trial court, which conducted a thorough voir dire, did not ask prospective jurors about their exposure to these past news accounts specifically, the court did describe the shooting for which Artis was on trial and asked jurors if they had heard, read or seen anything about it. One juror, who knew the murder victim, responded in the affirmative and was excused. The court also questioned prospective jurors about their familiarity with the dramatis personae of the trial and the neighborhood in which the shooting occurred. Even if Artis's trial counsel might have suggested additional questions about jurors' exposure to past news stories, we see no legitimate basis for charging that it was constitutionally deficient performance for him not to do so. Furthermore, Artis made no showing that he was prejudiced by the voir dire; he did not proffer that any juror was aware of the news accounts, let alone that any juror actually was prejudiced by them. We are satisfied that the trial court was not required to hold a hearing on this claim of ineffectiveness.

Artis's remaining claims of ineffectiveness consist of broad and unsupported assertions that his counsel might have done more than he did do to exclude supposed "other crimes" evidence, and did not remedy his "previous deficient performance" at the first trial. These claims were too vague and conclusory as presented to merit a hearing or entitle Artis to relief.

### III.

For the foregoing reasons, Artis's convictions are affirmed, as is the order denying his motion for a new trial pursuant to D.C.Code § 23–110.

*So ordered.*